IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO: 3:05-CR-0234-A |
| | ) | |
| TYRONE WHITE | ) | |

## MOTION FOR PROTECTIVE ORDER

COMES NOW the United States of America, by and through Leura Garrett Canary, United States Attorney for the Middle District of Alabama, and files the above-captioned motion as follows:

### FACTS

1. On October 4, 2005 a grand jury seated in the Middle District of Alabama indicted the defendant ("White"), at the time an Auburn, Alabama, police officer, on eight counts of violating the Hobbs Act (18 U.S.C. §1951(a)) by extorting money from individuals in exchange for favorable treatment in their City of Auburn Municipal Court cases. (doc. #1). Shortly thereafter, White began contacting the press, both television and print media, generally through the Opelika-Auburn News, and Auburn area television stations, to discuss his case. See Attachment A. None of the information included in those articles or television news stories was provided by the United States or its agents.

2. On or about October 12, 2005, White filed a Motion to Lift Electronic Monitoring Restrictions and Allow Defendant to Remain Out on Bond Pending Trial. (doc. #9-1). In that motion, White makes the unsubstantiated allegation that White's initial detention was motivated by "White's filing an EEOC charge [against the Auburn Police Department] on Thursday, October 6, 2005." Because this motion was later withdrawn (doc. # 26, 27), the United States did not address this unsubstantiated claim by White. Had it been necessary, the United States' response would have

been that the allegation was completely untrue, and that the undersigned knew nothing about an EEOC complaint until sometime after the filing of the motion to lift electronic monitoring (doc. #9-1) on October 12, 2005.

3. On or about November 2, 2005, the United States moved for a protective order in another matter in the Middle District of Alabama, United States v. George David Salum, III (Cr. No. 2:05-CR-0137-F). The United States filed for the motion for protective order in response to information that counsel for the defendant in that case, Julian L. McPhillips, Jr., ("McPhillips") had contacted at least one Montgomery, Alabama, television reporter asking the reporter to interview McPhillips for the purpose of McPhillips' publicly describing that defendant's "side of the story." Subsequent to the granting of the government's motion for protective ("gag") order, a local television station aired an interview with McPhillips who, despite the order, gave information surrounding that case.

4. On or about November 1, 2005, McPhillips again spoke with the Opelika-Auburn News, who printed an article entitled "Attorney for Auburn Cop Challenges Jury Process." See Attachment B. In this article, McPhillips is quoted as stating "Race is going to be a big part of this case." Thus, it is clear that it is McPhillips' intent to interject race not only into the trial but into the minds of prospective jurors as well.

## DISCUSSION

5. By engaging in such interviews or disclosures, oral or written, McPhillips exposes the venire to information which is inadmissible–an alleged racial bias towards White–in the trial of this case pursuant to the Federal Rules of Evidence and supporting caselaw. See, *e.g.*, Fed. R. Evid. 401-403, United States v. Smith, 231 F.3d 800 (11th Cir. 2000) (setting forth defendant's burden in a selective prosecution claim). There is no legitimate purpose for appearing on television or in the

newspapers to assert that his prosecution is racially motivated. White certainly has a right to pursue a discrimination suit against Auburn PD, and apparently has started that process through the filing of an EEOC complaint. White also has the right to allege a claim of selective prosecution through an appropriate motion. Smith, *supra*. However, neither the press nor the trial of the instant cause are the appropriate fora for White's unsubstantiated claims of racial discrimination.

6. Unless this Court issues a protective order proscribing this conduct, irreparable harm may be done to this Court's effort to seat a jury whose verdict must be based solely upon evidence properly admitted at trial. It is, in effect, McPhillips doing outside the courtroom what he cannot do inside the courtroom, to the prejudice of a fair and impartial resolution of the issues.

7. The United States has made no public statement regarding this case, other than the issuance of a standard press release summarizing , without comment, the "public record" contents of the indictment when returned by the Federal Grand Jury and only after the defendant made his initial appearance. See Attachment C. On every occasion when the press sought comment beyond that press release, generally in response to McPhillips' comments to reporters, the United States, through the undersigned, the United States Attorney's Office's press officer, and law enforcement officers, have declined comment. The United States will, of course, continue that practice.

8. This Court has broad discretion in issuing a "gag" order to restrain trial participants from making extrajudicial statements, when there is a reasonable likelihood that prejudicial publicity may prevent a fair trial. *See, e,g,,* Robert S. Stephen, *Prejudicial Publicity Surrounding a Criminal Trial: What a Trial Court Can Do to Ensure A Fair Trial in the Face of a 'Media Circus,'* 26 SUFFOLK U. L. REV. 1063 (1992). It is the obligation of the trial court–not White–to control release of information to the media in a criminal case so that it can govern the control and effect of publicity

surrounding a criminal trial. Sheppard v. Maxwell, 384 U.S. 333 (1966). The trial judge is permitted and should consider issuance of a "gag" order to prevent participants in a criminal trial from frustrating the proper functioning of criminal court proceedings, under circumstances where pretrial publicity would threaten the due administration of justice. Id. Finding that the trial court in Sheppard should have exercised its power to control the publicity about the trial, the Supreme Court stated:

> [T]he court should have made some effort to control the release of leads, information, and gossip to the press by police officers, witnesses, and counsel for both parties. Much of the information thus disclosed was inaccurate, leading to groundless rumors and confusion...
>
> The fact that many of the prejudicial news items can be traced to the prosecution, as well as the defense, aggravates the judge's failure to take any action. . . . Effective control of these sources concededly within the court's power might well have prevented the divulgence of inaccurate information, rumors, and accusations that made up much of the inflammatory publicity, at least after Sheppard's indictment.
>
> More specifically, the trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters...or like statements concerning the merits of the case.

Id. at 359-62.

9. While Sheppard spoke to the threat that publicity posed to the defendant's right to a fair trial, the same rationale guides this Court's protection of the United States' right to a fair trial. In Sheppard, where the defendant's conviction was overturned because extensive prejudicial pretrial publicity had denied the defendant a fair trial, the Court held that a new trial was a remedy for such publicity, but observed:

> [w]e must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court

staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures.  384 U.S. at 36.

We expressly contemplated that the speech of those participating before the courts could be limited. [FN5] This distinction between participants in the litigation and strangers to it is brought into sharp relief by our holding in Seattle Times Co. v. Rhinehart, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). There, we unanimously held that a newspaper, which was itself a defendant in a libel action, could be restrained from publishing material about the plaintiffs and their supporters to which it had gained access through court-ordered discovery. In that case we said that "[a]lthough litigants do not 'surrender their First Amendment rights at the courthouse door,' those rights may be subordinated to other interests that arise in this setting," Id., at 32-33, n. 18, 104 S.Ct., at 2207-2208, n. 18 (citation omitted), and noted that "on several occasions [we have] approved restriction on the communications of trial participants where necessary to ensure a fair trial for a criminal defendant." Ibid.

10. "As for extrajudicial statements by defense counsel and prosecutors, the standards of professional responsibility in every state include a provision placing limits on the content of their statements under specified circumstances." Wayne R. LaFave et al, CRIMINAL PROCEDURE, Sec. 23.1(b).  In this district, "[a] lawyer may not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding." Ala. R. Prof. Conduct 3.6(a); MDAL Local R. 83.1(f) (directing lawyers admitted to practice in the Middle District to comply with Alabama Rules of Professional Conduct). Prohibited statements include those relating to information likely to be inadmissible which would create a substantial risk of prejudicing an impartial trial.  Ala. R. Prof. Conduct 3.6(b)(5); see also Gentile v. State Bar of Nevada, 501 U.S. 1030, 1071 (1991) (analyzing Nevada Supreme Court rule prohibiting attorney from making extrajudicial statements to the press, when that attorney reasonably

should know that such statements have "substantial likelihood of materially prejudicing" adjudicative proceeding).

11. Lawyers in pending cases are subject to ethical restrictions on speech to which an ordinary citizen would not be. In re Sawyer, 360 U.S. 622, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959). "Obedience to ethical precepts may require abstention from what in other circumstances might be constitutionally protected speech." Id., at 646-647. Lawyers' speech, when representing clients in pending cases, may be regulated under a less demanding standard than that established for regulation of the press. The News-Journal Corp. v. Foxman, 939 F.2d 1499, 1512 (11th Cir. 1999), quoting Gentile, *supra*. The concerns avoided by the protective order sought by the government include "the threat posed to the fair trial rights of a criminal defendant," including "a trial by an impartial jury free from outside influences." The News-Journal Corp., 939 F.2d at 1513-14. Additionally, a protective order would help to ensure rights to speedy trial are preserved by avoiding postponement and change of venue. Id. at 1513, n. 16. Other alternative remedies–voir dire, jury sequestration, and jury instructions–may be ineffective to overcome a tainted venire. Id. While remedies to ameliorate the harmful impact of extrajudicial comment to the media about a pending case include continuance or change of venue, the need for either is avoided if this Court issues a protective order. Sheppard, 384 U.S. at 362.

12. The United States made no effort to restrict McPhillips' or White's earlier public statements, which began before White was charged and resumed with the return of the indictment. However, the circumstances are now considerably different: jurors are scheduled to be called for jury duty within weeks, and the trial of the case is scheduled to begin in approximately 30 days– December 5, 2005.

Accordingly, in the interest of justice, the United States respectfully requests that the Court issue a protective order prohibiting the parties from commenting to the news media from the issuance of the order until the return of the jury's verdicts.

RESPECTFULLY SUBMITTED this 4th day of November, 2005.

LEURA GARRETT CANARY
UNITED STATES ATTORNEY


/s/ Todd A. Brown
TODD A. BROWN
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
ASB-1901-O64T
Todd.Brown@usdoj.gov

**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | CR. NO: 3:05-CR-0234-A |
| | ) | |
| **TYRONE WHITE** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on November 4, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Julian McPhillips, Esquire.

    Respectfully submitted,

    LEURA GARRETT CANARY
    UNITED STATES ATTORNEY


    /s/ Todd A. Brown
    TODD A. BROWN
    Assistant United States Attorney
    Post Office Box 197
    Montgomery, Alabama 36101-0197
    (334) 223-7280
    (334) 223-7135 fax
    ASB-1901-O64T
    Todd.Brown@usdoj.gov