IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

UNITES STATES OF AMERICA )
 )
v. ) CASE NO. 3:05-CR-234-A
 )
TYRONE WHITE )

## DEFENDANT'S BRIEF IN SUPPORT OF
## MOTION TO DISMISS INDICTMENT AND FOR SANCTIONS

COMES NOW the defendant, Tyrone White, by and through his undersigned attorneys, and respectfully submits the following brief on *Defendant's Motion to Dismiss Indictment and for Sanctions* (Doc. 39).

### I. STATEMENT OF THE ISSUES BEFORE THE COURT

The following issues are before the Court:

#### Issue 1

**Should the District Court dismiss the Indictment now pending against the defendant, Tyrone White, due to intimidation and threats by government agents, wrongfully coercing false statements and grand jury testimony upon which the Indictment is based?**

#### Issue 2

**Are any additional sanctions against the United States due and proper under the facts of this case?**

### II. STATEMENT OF THE CASE

On October 4, 2005, a federal grand jury in the Middle District of Alabama entered an *Indictment* (Doc. 1) against the above-named defendant, Tyrone White, charging him with eight counts of violating the Hobbs Act, by soliciting money to adjust

citations, essentially solicitation of bribery. At all times alleged in the original eight counts, the defendant was a police officer for the City of Auburn, Alabama.

Inquiries by the defense revealed that a number of witnesses had been intimidated or coerced during the government's investigation, the source of the factual basis for the original *Indictment* (Doc. 1).

On November 16, 2005, the Defendant filed a *Motion to Dismiss Indictment and for Sanctions* (Doc. 39). Attached thereto were affidavits from eleven individuals, detailing how they were intimidated or coerced into making false statements by the Auburn police, often assisted by the Federal Bureau of Investigation.

Three of the affiants, Shenard Pitts, Jerry Stinson and Mitchell Giles, were identified in the Indictment as alleged victims of extortion. Each gave a sworn statement to the defense that he had been threatened and intimidated by the government into giving false statements against the defendant.

On November 16, 2005, a *Superseding Indictment* (Doc. 43) was entered in this case, incorporating the original eight counts, and adding a ninth count, alleging witness-tampering by the defendant.

This Court set an evidentiary hearing on the defendant's motion, commencing on November 30, 2005. The hearing reconvened on December 7, 2005, and then concluded on December 9, 2005. At this hearing, nine of the eleven affiants took the stand and gave testimony consistent with their sworn affidavits, which were admitted into evidence.

Importantly, four of the six persons identified as alleged victims in the original Indictment – Shenard Pitts, Jerry Stinson, Mitchell Giles and Daniel Todd – all testified

that government agents had intimidated and coerced them into giving false statements against the defendant.

Daniel Todd gave testimony contradicting his grand jury testimony, but stopped to consult his attorney upon received an instruction about perjury, at the government's request and over defense counsel's objection. Because Mr. Todd was not immediately able to reach his lawyer, the Court questioned Mr. Todd in a private, *in camera* meeting with only the attorneys present.

In that meeting, Daniel Todd confirmed the intimidation he was feeling from the government, saying that "**They have me here today under the same situation, scared about going to jail about telling the truth**…" (Todd, Tr. 2 at 58)[1].

Mr. Todd appeared on December 9, 2005, with his attorney, Margaret Brown, who advised him on the record to plead his Fifth Amendment privilege against self-incrimination.

Daniel Todd's testimony was corroborated by Shenard Pitts, whose testimony was further corroborated by two Auburn attorneys, James Cox and Gary Black, and by his wife, Michelle Pitts.

At the evidentiary hearing, the government presented evidence through eight witnesses, to support its overall position that the investigation was legitimate. At the conclusion of evidence, the Court directed the attorneys to prepare briefs, to assist it in its decision as to whether the indictment should be dismissed.

---

[1] Each day of the evidentiary hearing was transcribed by a different court reporter, Mitchell Reisner on November 30th; James Dickens on December 7th; and Risa Entrekin on December 9th. For ease of reference, these transcripts will be referred to as Transcript 1 (Tr. 1), Transcript 2 (Tr. 2), and Transcript 3 (Tr. 3), respectively.

## III. STATEMENT OF FACTS

### A. Background

The investigation in this case was initiated by the Auburn Police Department. The Chief of Police, Frank deGraffenried, appointed Auburn Police Officer Jerry Holder to conduct an internal investigation of Officer Tyrone White, a 16-year veteran of the Auburn Police Department, and a United States Marine for six years before that.

In February 2005, a number of African-American officers in the Auburn Police Department requested a meeting with the Chief of Police to voice their concerns about the racism prevalent throughout the department. See the EEOC Charge, previously filed herein as *Exhibit D* (Doc. 9-2) to defendant's *Motion to Lift Electronic Monitoring Restrictions and Allow Defendant to Remain Out on Bond Pending Trial* (Doc. 9-1). Officer White took a leadership role for these officers, despite warnings to him that taking action on the race issue would hurt Officer White's career. (Doc. 9-2, at 6).

Racism in the Auburn Police Department had been a long-standing problem. Even Officer Holder admitted on the stand that the "N-word" was used around the Auburn Police Department, and that he had done nothing to stop it. (Holder, Tr. 2 at 229). Despite the extent of the problem, these black police officers were not permitted to meet with the Chief, but instead met with an intermediary.

It was shortly after this meeting that Officer White, the defendant, was investigated on allegations of taking money for adjusting tickets. The defendant contends that this was a punitive personnel action by the Auburn Police Department, inspired, if not instigated by the United States' lead investigative officer in this criminal case, Officer Jerry Holder.

Officer Holder did not see anything unusual about arresting and bringing people down to the station for questioning on fines, when the real purpose was clearly to build a case against Officer White. (Holder, Tr. 2 at 250-53). Officer Holder further admitted cursing at least one subject of his investigation. (Holder, Tr. 2 at 256-58). These admissions reflect a glaring lack of professionalism, the very opposite of which citizens of Auburn, black and white, are entitled to expect from their sworn peace officers. They also belie a troubling disregard for common decency.

At the evidentiary hearing, four of the six alleged victims named in the Indictment – Jerry Stinson, Shenard Pitts, Mitchell Giles and Daniel Todd – all testified under oath that they never gave the defendant any money in exchange for favors. Instead, they said they were bullied, threatened and intimidated by Auburn police officers, frequently by Officer Jerry Holder, into giving false statements.

None of the twelve witnesses called by the Defendant had ever given Tyrone White any money, nor had any heard of anyone giving Tyrone White any money for adjusting tickets.

In the course of investigating this defendant, Auburn Police Officers, working with agents of the Federal Bureau of Investigation, contacted many citizens of Auburn. At some point, Auburn Municipal Court Judge Joe S. Bailey turned over the entire court files of dozens of criminal cases, in an unprecedented move to assist in the investigation. In fact, Judge Bailey told Mrs. Pitts that he would "not release her husband until Mr. Pitts cooperated with 'his' police."

The case was referred to the United States Attorney's Office, and was ultimately presented to the grand jury that returned the original indictment.

## B. Witnesses Identified in the Indictment

### 1. Jerry Stinson
### COUNT 1

Jerry Stinson testified before the grand jury in this case, and is the alleged victim identified in **Count 1** of the indictment in this case. After being placed under oath in the evidentiary hearing, Mr. Stinson was immediately given an instruction on perjury, at the government's request. Mr. Stinson indicated his understanding and proceeded to testify, despite the Court's warning. (Stinson, Tr. 1 at 25).

Although this instruction was clearly intimidating, Mr. Stinson consistently told the truth about what happened. Mr. Stinson bravely testified that his grand jury testimony had been false. He said he lied at the grand jury because at that time, he thought he had to stick to the statement he had given law enforcement under questioning.

Mr. Stinson is a 33 year old, black man, residing in Auburn, Alabama. A graduate of Auburn High School in 1992, Mr. Stinson has worked for a lumber company for eight years. He has never been a plaintiff in a lawsuit, nor has he ever been summoned to testify in court. Further, before his involvement in this case, Mr. Stinson has never spoken to a lawyer. (Stinson, Tr. 1 at 77-78).

On October 18, 2005, Julian McPhillips met with Shenard Pitts at the law office of Attorney James Cox, in Auburn, Alabama. At some point during that meeting, Jerry Stinson arrived at Mr. Cox's office, asking to speak to Mr. McPhillips. Mr. Stinson came of his own accord and told Mr. McPhillips that he wanted to make a statement about what had happened to him. (Stinson, Tr. 1 at 26).

Mr. Stinson chose to come forward because "the statement that I told them first, that I didn't pay Tyrone any money, that was true. But they said they had a warrant for

6

my arrest… And they scared me, and I was scared of losing my job… And that's why I made that statement, saying that I paid Tyrone, but it wasn't true." (Stinson, Tr. 1 at 27).

Mr. Stinson gave a statement, which was prepared by the defense and returned to Mr. Stinson the next day for his review and signature. See Affidavit of Jerry Stinson, admitted as Defense Exhibit 12 and incorporated herein by reference.

On the Friday before the grand jury met, Mr. Stinson was at work, when he was told that two men wanted to speak to him. These men were Auburn Police Officer Willie Smith and Federal Agent Kelvin King. Mr. Stinson thought the men were going to talk with him outside, but they escorted Mr. Stinson to a vehicle and took him downtown, to Auburn Police headquarters. At the police department, Officer Smith and Agent King took Mr. Stinson into a room and told him they had a warrant for his arrest. (Stinson, Tr. 1 at 37-38). Mr. Stinson was shown a copy of his mug shot and told about the charges pending against him. At the same time, Officer Smith and Agent King asked about whether Mr. Stinson had paid the defendant to take care of charges.

In fact, Mr. Stinson had never talked to the defendant (Stinson, Tr. 1 at 43), and he had certainly never talked to the defendant about any tickets, but "they didn't want to hear that." (Stinson, Tr. 1 at 29). Finally, Mr. Stinson lied to stay out of jail. (Stinson, Tr. 1 at 41). Officers Smith and Agent King had scared him into saying he had paid Tyrone money.

On Sunday, the day before the grand jury, Mr. Stinson tried to contact Officer Smith, even going to his home and the police department, without success. Then Mr. Stinson called Agent King and left a message, saying that the statement Stinson had made on Friday was not true, that Stinson had been scared and that he had made the false

statement because he was afraid of going to jail. (Stinson, Tr. 1 at 30, 40, 67). Mr. Stinson had a change of heart because he felt bad, "because the statement wasn't true. It wasn't true." (Stinson, Tr. 1 at 41).

Mr. Stinson did not hear from either Officer Smith or Agent King, on Sunday, but the next day, the two of them pulled up. Officer Smith and Agent King told Mr. Stinson that he would get "jammed up" if he changed his story now. (Def. Ex. 12 at Para. 5). Officer Smith and Agent King also told Mr. Stinson not to talk to anybody about what had happened. (Stinson, Tr. 1 at 45).

Mr. Stinson never gave any money to the defendant, and the defendant never did any favors for Mr. Stinson. Further, the defendant never threatened or caused Mr. Stinson any fear. (Tr. 1 at 33-34). Jerry Stinson is the "J.S." identified in Count One of the *Indictment* (Doc. 1). (Stinson, Tr. 1 at 33). Mr. Stinson testified that the sole basis for that charge was a false statement given by him under threat of imprisonment.

Mr. Stinson did not complain to Agent King about being coerced into giving a false statement because "… Mr. Smith and Mr. King [were] inside the same room…It was those two" who had pressured him into it. (Stinson, Tr. 1 at 45). Further, Mr. Stinson never pulled aside any other federal agent or prosecutor to complain about his treatment because "at that time…I didn't understand the law…I didn't know if I could do that, or not." (Stinson, Tr. 1 at 47).

Mr. Stinson was very scared at the grand jury. None of the federal agents or federal prosecutors did anything to try to help alleviate Mr. Stinson fear at the grand jury, nor did they explain to Mr. Stinson that he could change his testimony. (Stinson, Tr. 1 at 74).

Mr. Stinson did not tell anyone that he had been threatened with jail time for his testimony. "Mr. Smith knew it, but I didn't know if I could tell anybody if Mr. Smith, he knew it." Understandably, Mr. Stinson thought the police and federal agents and United States Attorneys were all working together – because they were. Mr. Stinson did not know whether he could tell one part of the government what another part was doing wrong, without suffering further mistreatment.

After his affidavit (Def. Ex. 12) was filed in this case, Mr. Stinson was again approached by Auburn police officers and federal agents, twice, causing him to feel harassed and threatened. Law enforcement were coming to Mr. Stinson's job, and his employer was getting tired of it. (Stinson, Tr. 1 at 70). The visits were also interfering with Mr. Stinson's work.

## 2. Daniel Todd
### COUNT 2

Daniel Todd testified before the grand jury in this case, and is the alleged victim identified in **Count 2** of the indictment in this case. Mr. Todd is a 31 year old black man who has an 11th grade education and works as an auto mechanic. (Todd, Tr. 2 at 26-27). Mr. Todd was pulled over by the Auburn police on Opelika Road, a busy thoroughfare. The officers made Mr. Todd wait until they could bring out some police working dogs to check Mr. Todd's vehicle for drugs. Mr. Todd was very embarrassed by the whole situation, especially because cars were backed up and everyone was looking at him. (Floyd, Tr. 2 at 11-12). Finally, the police took Mr. Todd down to Lee County Jail.

After being placed under oath in the evidentiary hearing, Mr. Todd was allowed to testify for some time before the government requested an instruction on perjury. Mr. Todd confirmed four times that he never gave the defendant any money to adjust a ticket.

(Todd, Tr. 2 at 20-21). Mr. Todd also confirmed at twice that the defendant had never asked Mr. Todd for any money. (Todd, Tr. 2 at 20-21)

At this point in the direct examination, Assistant United States Attorney Todd Brown interrupted the questioning to request an instruction that Mr. Todd was exposing himself to prosecution for perjury. The court then very carefully instructed Mr. Todd as to his rights. (Tr. 2 at 22-29). Once instructed, Mr. Todd asked to consult with his lawyer before testifying further. (Todd, Tr. 2 at 29).

In an *in camera* proceeding, the Court asked what Mr. Todd was afraid of "today." **Mr. Todd replied simply that he was afraid they were going to throw him back in jail because of his testimony at the hearing.** (Todd, Tr. 2 at 57-58). Mr. Todd was afraid of the government punishing him for testifying against their case.

The government alleged that Mr. Todd was intimidated by the spectators in the courtroom, many of whom were friends and family of the defendant. However, in the *in camera* meeting with only the witness, the Court and the attorneys present, the Court asked why Mr. Todd did not want to proceed with his testimony today. Mr. Todd replied:

> THE WITNESS: I would rather talk to my lawyer because I mean when it first happened I was throwed in jail for four days and I had to give them a testament saying one thing to even get out of jail. They didn't want to let me out of jail. They have me here today under the same situation, scared about going to jail about telling the truth, still about the situation. I was stopped and I was thrown in jail for four days, I had a little fine. My fiancé went to pay the fine, they wouldn't let me out. I went back four days later, they told me if I cooperate and tell them what they want to hear they will let me out that day.
>
> THE COURT: So you have a fear today about what?
>
> THE WITNESS: The whole situation. I mean if I give another testament, if it's true still, if they don't – if they

don't think it's true, the United States, I still perjure myself
and go to jail.

(Todd, Tr. 2 at 58).

On advice of counsel, Daniel Todd later invoked his Fifth Amendment privilege

and refused to testify further, and was excused. (Tr. 3 at 3-4).

### 3. Shenard Pitts
### COUNT 3

Shenard Pitts did not testify before the grand jury in this case, but is nonetheless

the alleged victim identified in **Count 3** of the indictment in this case.

Auburn Attorney James Cox saw his tax client, Shenard Pitts, at the Lee County

Correctional Justice Center, wearing a trustee's uniform. (Cox, Tr. 1 at 83). A few weeks

later, Mr. Pitts called Attorney Cox to tell him what had happened.

Attorney Cox agreed to contact and arrange a meeting with Julian McPhillips, so

that Mr. Pitts could set the record straight. (S. Pitts, Tr. 1 at 123). Attorney Cox had

advised Mr. Pitts that he had a real problem, if he was going to change his story now. But

Mr. Pitts said, "I don't know how to solve this. I don't know how to fix this. **I didn't tell**

**the truth in that affidavit that I gave the police and I just don't know what to do. I**

**didn't tell the truth**." (Cox, Tr. 1 at 87).

On October 18, 2005, Mr. Pitts met with Attorneys McPhillips and Cox, and a

statement was prepared as Mr. Pitts spoke. Both Mr. Pitts and Attorney Cox reviewed the

statement before Mr. Pitts signed it, and Attorney Cox notarized it. See <u>Affidavit of</u>

<u>Shenard Pitts</u>, admitted as <u>Defense Exhibit 10</u> and incorporated herein by reference.

Mr. Pitts, a 33 year old black man, was at work one Friday when his wife called to

ask what he had done to warrant three cars of police officers and federal agents to come

looking for him at the house. Mr. Pitts had not done anything, to his knowledge. Later, Mr. and Mrs. Pitts went to Auburn police headquarters to find out what was going on. (M. Pitts, Tr. 1 at 168-169). Mr. Pitts was questioned for "a couple of hours" by Officers Jerry Holder and Willie Smith, along with a federal agent. (S. Pitts, Tr. 1 at 110).

Mr. Pitts told them he and never given money to the defendant for adjusting tickets, and did not know what they were talking about. (S. Pitts, Tr. 1 at 110). As he was leaving the interview, Mr. Pitts was arrested, placed in handcuffs and put in jail that afternoon. (Cox, Tr. 1 at 86; S. Pitts, Tr. 1 at 111). His wife had not even been told that he was being put in jail, but saw him outside as they were taking him away. When she asked what the charges were, Mr. Pitts told her "I really don't know." (M. Pitts, Tr. 1 at 170). He was later told that Judge Bailey had unsuspended his six month sentence on a previous charge. (S. Pitts, Tr. 1 at 111).

While in jail, Mr. Pitts spoke to Daniel Todd, who was also incarcerated there. Mr. Todd told Mr. Pitts that "the police had been trying to – wanted him to say that he had paid Tyrone for some tickets. [Todd] said he hadn't done so, and that's what he had been locked up for, the same thing I had been locked up for." (S. Pitts, Tr. 1 at 113-114). Mr. Todd told Mr. Pitts that the police had asked him questions about the defendant, and had accused Mr. Todd of paying the defendant for a ticket. Mr. Todd had denied it, and they reinstated his sentence too. (S. Pitts, Tr. 1 at 114).

Then, at some point, Mr. Pitts was brought out of jail to appear before Municipal Court Judge Bailey. Mr. Pitts was returned to Lee County Jail when he would not cooperate with his (the Judge's) police. (S. Pitts, Tr. 1 at 115; Def. Ex. 10 at 2). Judge Bailey told Mr. Pitts to go talk with the police again. If the police did not hear what they

wanted, then Mr. Pitts would go back to jail, and would stay there until he cooperated. (S. Pitts, Tr. 1 at 115).

From there, a federal agent and Officer Jerry Holder took Mr. Pitts to a room and interrogated him again. Officer Smith told Mr. Pitts to go ahead and say what they wanted because "Tyrone's ship is going to sink." (S. Pitts, Tr. 1 at 116, 136; Def. Ex. 10 at 3). At the end of this questioning, Mr. Pitts was put back in jail. (S. Pitts, Tr. 1 at 116).

While at Municipal Court, Daniel Todd told Mr. Pitts that he was going to tell the police what they wanted to hear because he had a business to run, and he could not take care of business as long as he was in jail. (S. Pitts, Tr. 1 at 136). Mr. Todd was released that day.

Judge Bailey blocked Mr. Pitts from work release, and assigned him to work detail, picking up trash from public areas. (S. Pitts, Tr. 1 at 119; Def. Ex. 10 at 2). Mr. Pitts' wife, Michelle, went twice to Auburn Municipal Court to try pay her husband's fines. (S. Pitts, Tr. 1 at 117; M. Pitts, Tr. 1 at 170-172, 176-179). In open court, Judge Bailey told Ms. Pitts that her husband was not cooperating with his police officers, and that Mr. Pitts would not be released until he cooperated. (M. Pitts, Tr. 1 at 172-174). Ms. Pitts had the $2,100 to pay her husband's fine, but Judge Bailey would not take it. (S. Pitts, Tr. 1 at 118).

Mr. Pitts' wife also retained Auburn Attorney Gary Black to work on getting her husband out of jail. Attorney Black told Mr. Pitts that Judge Bailey would not release him unless Mr. Pitts told the police what they wanted to hear. Mr. Pitts told Attorney Black that he had never paid the defendant any money. (S. Pitts, Tr. 2 at 123). Mr. Pitts said,

"Well, I can tell them a lie," to which Attorney Black replied "Just tell them what they want to hear." (S. Pitts, Tr. 1 at 120, 138).

Attorney Black indicated to Mr. Pitts that he would not be released unless he cooperated with the police. (S. Pitts, Tr. 1 at 120, 138). Attorney Black, a 25 year veteran of the Auburn police department before becoming an lawyer, did not find it strange that they would not let Mr. Pitts out of jail until he cooperated with the police, even though his wife had tried to pay his fines. Attorney Black went on to say "That's how it works in our society," and that he assumes cooperating with the police is telling the truth. (Black, Tr. 2 at 127-128)

Mr. Pitts said he "needed to get out of jail," and that "I've got a wife and three kids, and I'm the only one working and I had to do what I had to do to get out of jail." (Cox, Tr. 1 at 86). He was worried from all the pressure that had been put on him by law enforcement. (S. Pitts, Tr. 1 at 121). Attorney Black arranged for Mr. Pitts to have a meeting with Officers Holder and Smith. (Black, Tr. 2 at 122).

Officers Holder and Smith had told Mr. Pitts that he had to cooperate in order to get out. Because they had locked him up, Mr. Pitts felt threatened and coerced to make a statement implicating the defendant, even though "That was untrue." (S. Pitts, Tr. 1 at 161). Finally, after being in jail **almost five weeks**, Mr. Pitts told the police "what they wanted to hear." (Cox, Tr. 1 at 86; S. Pitts, Tr. 1 at 121). **He was released from jail the very next day**. (Tr. 1 at 123).

Since then, Mr. Pitts has recanted most of the statement he made to law enforcement, had been prepared by Officer Jerry Holder. (S. Pitts, Tr. 1 at 145-152, 156). Mr. Pitts, the "S.P." identified in Count 3 of the *Indictment* (Doc. 1), has also testified

that the allegations set forth therein are false. Mr. Pitts "never gave [the defendant] a dime." (S. Pitts, Tr. 1 at 158). The defendant never demanded or accepted any money from Mr. Pitts for favorable treatment, or for any reason. (S. Pitts, Tr. 1 at 159).

After the affidavit was filed, a federal agent approached Mr. Pitts at work about the affidavit (Def. Ex. 10), causing Mr. Pitts to feel somewhat harassed. (S. Pitts, Tr. 1 at 124). To this day, Mr. Pitts is afraid of what the government may do to retaliate against him for telling the truth.

### 4. Mitchell Giles
### COUNT 5

Mitchell Giles testified before the grand jury in this case, and is the alleged victim identified in **Count 5** of the indictment in this case. Mr. Giles does not have a high school diploma or a GED, and works as a brick mason. (Giles, Tr. 1 at 200).

On October 18, 2005, Mr. Giles sought out Julian McPhillips to give a statement about what had happened to him. A written statement was prepared and returned to Mr. Giles for his review and signature the next day. (Giles, Tr. 1 at 192-193). See Affidavit of Mitchell Giles, admitted as Defendant's Exhibit 14, and incorporated herein by reference. Mr. Giles reviewed the statement very carefully before signing it. (Giles, Tr. 1 at 194).

After being placed under oath in the evidentiary hearing, Mr. Giles was immediately given an instruction on perjury, at the government's request. Mr. Giles indicated his understanding and proceeded to testify, despite the Court's careful warning. (Giles, Tr. 1 at 180-182).

Mitchell Giles is a 36 year old black man. Mr. Giles had been caught in the housing projects after having been banned from them, and as a result was facing 30 days in jail. (Giles, Tr. 1 at 184-185). Prior to this incident, Mr. Giles had been caught in the

projects by the defendant, and admitted harboring resentment against him. Nonetheless, Mr. Giles was persuaded by the defendant's father-in-law to speak with the defendant, and ask if the defendant could help him. The defendant spoke to the arresting officer, and Mr. Giles was only required to pay a fine to the City. (Giles, Tr. 1 at 187). Mr. Giles never paid anyone for help with this ticket. (Giles, Tr. 1 at 187).

Shortly after that, Mr. Giles learned that the Auburn police and federal agents had been looking for him at his mother's home at all hours of the day and night. (Giles, Tr. 1 at 188). Mr. Giles' mother did not want law enforcement coming to her house "night after night," and gave her son's cellular phone number to the police. (Giles, Tr. 1 at 204).

The police then began harassing Mr. Giles by cellular phone, until finally Officer Jerry Holder called and told Mr. Giles to go down to the police station to talk with them and said, "**Bring your ass down here, boy**." (Giles, Tr. 1 at 188). At this point, Mr. Giles really felt threatened, and could not work because the police were calling all the time. Law enforcement had made it clear that that he would be "doing some jail time" if he did not go down to the station. (Giles, Tr. 1 at 189, 206).

Mr. Giles did not want to go to jail, so he went to Auburn police headquarters to meet with law enforcement. Once there, Mr. Giles was interrogated for four hours by Officer Jerry Holder, with an FBI agent present. Mr. Giles told the truth, that he had not paid Tyrone White, but they already had a statement written out for me and that was not what they wanted to hear, so they threatened to lock Mr. Giles up. (Giles, Tr. 1 at 190, 209; Def. Ex. 14 at Para. 11).

At this point the FBI agent left the room, and Officer Holder threatened that, if Mr. Giles did not tell them that he had paid Tyrone White money in exchange for taking

care of his charges, Officer Holder already had a call in for someone to take Mr. Giles to Lee County Jail. (Giles, Tr. 1 at 191; Def. Ex. 14 at Para. 12). Officer Holder told Mr. Giles that he could have Giles locked up right then and now. Officers Holder and Smith further made it clear that he wanted Mr. Giles to say he had paid Tyrone White money in exchange for taking care of his charges. (Giles, Tr. 1 at 192, 208; Def. Ex. 14 at Para. 12).

At this point, Mr. Giles gave up and told Officer Holder what Holder wanted to hear, because he felt pressured, and coerced, and did not want to spend the weekend in jail. (Giles, Tr. 1 at 193; Def. Ex. 14 at Para 13). Then Officer Holder said that he felt Mr. Giles had told the truth, and released him. Officer Holder also said that if Mr. Giles told the grand jury the same thing, that would be the end of it, and Mr. Giles would not be called to testify at trial. (Giles, Tr. 1 at 194; Def. Ex. 14 at Para. 14).

At the grand jury, Mr. Giles was going to do what they told him to do, "to go in there and keep the story that I had already made up…that was going to be it." (Giles, Tr. 1 at 222). Mr. Giles agreed to do this because he did not want to go to jail. He was never told that he could go to jail for lying to the grand jury. (Giles, Tr. 1 at 222).

After the grand jury hearing, Mr. Giles "felt badly about being pressured and tortured by the Auburn police to tell a lie on Tyrone White." (Giles, Tr. 1 at 194). Mr. Giles came forward to make the truth known, in spite of being instructed about the penalties of perjury at the evidentiary hearing. (Giles, Tr. 1 at 243-244). Mr. Giles never gave the defendant any money, and the defendant never asked Mr. Giles for money. (Giles, Tr. 1 at 197).

Mr. Giles felt fear, coercion and threat from the government and the Auburn police. Even at the evidentiary hearing, law enforcement kept "rolling their eyes" and

looking at Mr. Giles "all funny and stuff." (Giles, Tr. 1 at 198). Mr. Giles identified Officers Smith, Holder and Worth, as well as federal agent Paul Houston, as law enforcement who have threatened or harassed him. (Giles, Tr. 1 at 199-200).

After his affidavit was filed herein, law enforcement approached Mr. Giles four or five times. Each time made Mr. Giles feel harassed and very threatened because of their tone of voice and the manner in which they talked to him on the phone. (Giles, Tr. 1 at 195-196). Law enforcement would call and say they needed to see him, and when Mr. Giles did not want to go, they said they would come see him "one way or another." The police harassment is affecting his work. The police still bother his seventy-year old mother, who worries about it. It is **"just torture."** (Giles, Tr. 1 at 196).

### C. Defense Witnesses Not Identified in the Indictment

#### 1. Adam Floyd

Adam Floyd is a 34 year old black man, who has lived in Auburn around 28 years. Private Investigator Billy Smith contacted and obtained a recorded statement from Adam Floyd, which was later prepared into an affidavit and signed by Mr. Floyd on October 24, 2005. See Affidavit of Adam Floyd, admitted as Defendant's Exhibit 24, and incorporated herein by reference.

Mr. Floyd runs a car wash and barbershop in Auburn, where he was contacted by federal Agent Kelvin King. (Floyd, Tr. 2 at 5). Agent King called Mr. Floyd to say he wanted to talk about the defendant. Agent King told Mr. Floyd to meet him at the Waffle House, to avoid the embarrassment of having law enforcement come to his business. (Floyd, Tr. 2 at 6; Def. Ex. 24 at Para. 3).

Mr. Floyd told Agent King that he wanted to consult with his attorney before meeting with the FBI. (Floyd, Tr. 2 at 7). Very shortly after this conversation, Agent King showed up at Mr. Floyd's business with five or six Auburn police officers and FBI agents. (Floyd, Tr. 2 at 7; Def. Ex. 24 at Para. 5).

To keep from alarming his customers, Mr. Floyd met with Agent King and Auburn Police Officer Willie Smith in his office. They left three or four officers positioned in front of the business, causing a number of Mr. Floyd's customers to leave.

Meanwhile, Officer Smith told Mr. Floyd that he needed to "do the right thing." Mr. Floyd did not know what they were talking about, and would not say anything until he contacted his attorney. Agent King and Officer Smith gave Mr. Floyd a subpoena to testify before the grand jury. (Floyd, Tr. 2 at 8).

While Mr. Floyd was in the office with Agent King and Officer Smith, the other officers standing outside told Mr. Floyd's business partner, Winfred White, that if Mr. Floyd did not tell them what they wanted to hear, then Winfred White would have to start looking for another place to work. The officers commented that it was a good thing Winfred White had received a degree in engineering, because the police were going to close Mr. Floyd down, and Winfred White was going to need to find another job. (Floyd, Tr. 2 at 9-10).

After this meeting, the Auburn police began harassing Mr. Floyd, by increasing the police presence and driving in front of the business very slowly, and staring at people in the barber shop, and intimidating them. (Floyd, Tr. 2 at 14-15). Customers were deterred from going to Mr. Floyd's business because of the police behavior. Mr. Floyd called Officer Smith to try to put a stop to the intimidating behavior. Mr. Floyd also

called the Mayor of Auburn to complain, after which the intimidating activity decreased for a week or two.

At some point, before the grand jury hearing, Officers Holder and Murray went to Mr. Floyd's business in a marked police vehicle, which they parked in front with the overhead lights flashing, to retrieve the subpoena and to inform Mr. Floyd not to go to the grand jury. (Floyd, Tr. 2 at 9).

Mr. Floyd's cousin, Daniel Todd, <u>did</u> testify before the grand jury. Mr. Todd told Mr. Floyd that he had been pulled over, near a restaurant. Although Mr. Todd has no criminal record, the Auburn police officers brought some drug dogs to the scene and searched Mr. Todd's car, embarrassing him, as cars were backed up looking at him. They arrested Mr. Todd and took him to jail. (Floyd, Tr. 2 at 12).

### 2. Winfred White

Winfred White is a 26 year old black man. Winfred White works with Adam Floyd, at this barber shop and car wash. Private Investigator Billy Smith contacted and obtained a recorded statement from Winfred White, which was later prepared into an affidavit and signed by Mr. White on October 24, 2005. See <u>Affidavit of Winfred White, Jr.</u>, admitted as <u>Defendant's Exhibit 26</u>, and incorporated herein by reference.

The Auburn police and federal agents came in two cars, and asked Mr. White to go with them to Auburn police headquarters. Once there, Mr. White was questioned by two federal agents and Officer Holder, about whether he had paid Tyrone White money to adjust tickets. (White, Tr. 2 at 37-38; Def. Ex. 26 at Para. 3-4). Winfred White had not paid Tyrone White for anything, but the interrogating officers did not believe he was

telling the truth, making him very uncomfortable and unsure what the outcome of this interrogation would be. (White, Tr. 2 at 38-42).

Auburn police officers came to Mr. Floyd's business and told Mr. White that he was going to have a chance to use his engineering degree because he was going to have to find somewhere else to work. This made Mr. White nervous and scared because he did not know what was going to happen. (White, Tr. 2 at 42-44).

Mr. White was most threatened when the police threatened his job and when the police would come by the shop all the time. The public perception that something was going on with the shop because loads of police officers and agents were frequenting the business, was hurting business. (White, Tr. at 53).

### 3. Myrtis Henderson

Myrtis Henderson is a 53 year old black female. Private Investigator Billy Smith contacted and obtained a recorded statement from Myrtis Henderson, which was later prepared into an affidavit and signed by Ms. Henderson on October 24, 2005. See Affidavit of Myrtis (Nora) Henderson, admitted as Defendant's Exhibit 16, and incorporated herein by reference.

Ms. Henderson was approached by Auburn police officers, while at a relative's home. The police asked her to go with them and answer some questions. The police asked if she had paid Tyrone White to adjust a ticket. Ms. Henderson told the police officers she had not paid Tyrone White, and the officers accused her of lying to them. (Henderson, Tr. 2 at 68; Def. Ex. 16 at Para. 3-5).

Ms. Henderson was embarrassed to be questioned by police at someone else's home, and was further embarrassed when the officers asked her to go with them for a

drive. Ms. Henderson felt pressured by the police, and wondered what she had done wrong to warrant questioning at the hands of the police. (Henderson, Tr. 2 at 68; Def. Ex. 16 at Para. 6-7).

### 4. Willis Bass

Willis Bass is a 36 year old black man. Private Investigator Billy Smith contacted and obtained a recorded statement from Willis Bass, which was later prepared into an affidavit and signed by Mr. Floyd on October 24, 2005. See Affidavit of Willis Edward Bass, admitted as Defendant's Exhibit 18, and incorporated herein by reference.

Mr. Bass was questioned by FBI Agent Kelvin King and Auburn Police Officer Willie Smith about whether he had given any money to Tyrone White. Mr. White had taken care of a speeding ticket for Mr. Bass, but Mr. Bass had not given the defendant anything in return. (Bass, Tr. 2 at 75-76; Def. Ex. 18 at Para. 3-4).

Agent King and Officer Smith did not believe Mr. Bass. They kept asking the same questions over and over. They also told Mr. Bass that Mr. Pitts had contradicted Mr. Bass' story. Mr. Bass told the investigators to call Mr. Pitts down to the station, so they could sort out the truth of what happened, but the officers declined to do so and backed off. (Bass, Tr. 2 at 77-78; Def. Ex. 18 at Para. 6).

Agent King and Officer Smith asked the same questions over and over to try and confuse Mr. Bass, but Mr. Bass remained consistent about the truth. At the end of the interview, they told Mr. Bass that he might be subpoenaed to testify before the grand jury, but was never called. (Def. Ex. 18 at Para 8).

### 5. Donald Copeland

Donald Copeland is a 36 year old black man. Private Investigator Billy Smith contacted and obtained a recorded statement from Donald Copeland, which was later prepared into an affidavit and signed by Mr. Copeland on October 24, 2005. See Affidavit of Donald Lee Copeland, admitted as Defendant's Exhibit 22, and incorporated herein by reference.

Mr. Copeland had never asked the defendant to take care of any tickets for him, and had not given the defendant anything. Mr. Copeland was pressured by law enforcement into giving a false statement about the defendant. They threatened to subpoena Mr. Copeland's wife, and to put both Mr. Copeland and his wife in jail. (Copeland, Tr. 2 at 87; Def. Ex. 22 at Para. 5-6).

The FBI embarrassed Mr. Copeland by bringing up all kinds of things from his past. They also asked if Mr. Copeland had ever had money taken out of his check to be paid to Tyrone White. Mr. Copeland told the FBI that he had not given Tyrone White any money and had not had any money taken out of his check. The FBI threatened to subpoena Mr. Copeland's wife.

In the presence of the FBI agent, the Auburn police told Mr. Copeland that they were going to put both Mr. Copeland and his wife in jail because the thought Mr. Copeland was lying to them. The Auburn police said that Mr. and Mrs. Copeland were both going to be in trouble and that they would be put in jail. (Copeland, Tr. 2 at 87; Def. Ex. 22 at Para. 5-6).

Mr. Copeland has a four year-old son. The Auburn police asked Mr. Copeland what they were going to do with their son when he and his wife got thrown in jail.

(Copeland, Tr. 2 at 87-88). Mr. Copeland felt that he had to do what the police were asking in order to take care of his family. The Auburn police told Mr. Copeland not to tell anyone about this conversation.

After the interview, the police followed Mr. Copeland home from work and stopped him for driving on a suspended license. Then later, the police went and arrested Mr. Copeland at work. (Copeland, Tr. 2 at 88-89). The police told Mr. Copeland that he was being arrested for failure to appear at a hearing. Mr. Copeland had retained an attorney to represent him in the pending matter, and felt he was wrongly arrested because he was not cooperating with the investigation of Tyrone White.

Mr. Copeland was also called to testify before the grand jury. They asked if Mr. Copeland had ever given the defendant any money or favors in exchange for taking care of tickets. Mr. Copeland had never asked the defendant to take care of any tickets for him. (Copeland, Tr. 2 at 91-92)

### 6. Norman Pitts

Norman Pitts is a 34 year old black man who has worked for the City of Auburn for ten years. Private Investigator Billy Smith contacted and obtained a recorded statement from Norman Pitts, which was later prepared into an affidavit and signed by Mr. Pitts on October 24, 2005. See Affidavit of Norman Pitts, admitted as Defendant's Exhibit 20, and incorporated herein by reference.

Mr. Pitts was questioned about the defendant twice. Mr. Pitts also testified before the grand jury. The first time he was questioned, he had just gotten off work, when his brother called to say that Auburn police officer Tommy Dawson wanted to speak to him. Mr. Pitts thought it was about some construction work he had done on Officer Dawson's

house. When Mr. Pitts called, Officer Dawson did not want to talk to Mr. Pitts over the phone, and asked Mr. Pitts to come to his personal residence. (N. Pitts, Tr. 2 at 97; Def. Ex. 20 at Para. 4)

Officer Dawson had called Mr. Pitts' brother three or four times to say that Mr. Pitts was going to be in a lot of trouble. Once Mr. Pitts arrived, Officer Dawson asked Mr. Pitts if he knew that Tyrone White was under investigation. Mr. Pitts did not. (N. Pitts, Tr. 2 at 99-100; Def. Ex. 20 at Para. 5).

Officer Dawson said that he knew Mr. Pitts had been caught driving under the influence. Officer Dawson tried to convince Mr. Pitts to say he had given the defendant some money to make the DUI charge go away, telling Mr. Pitts that the defendant was "not worth trying to protect." (Def. Ex. 20 at Para. 6-7).

Officer Dawson said Mr. Pitts could lose his job at the City for this, and that he could lose his house. He asked if Mr. Pitts had a wife and children, and whether he had a house. Officer Dawson told Mr. Pitts what a shame it would be to lose all of that. He also told Mr. Pitts that Mr. Pitts could end up in prison. (N. Pitts, Tr. 2 at 100-101; Def. Ex. 20 at Para. 7).

Officer Dawson then called Officer Jerry Holder, who showed up a few minutes later. Officer Holder questioned Mr. Pitts and told Mr. Pitts that Tyrone White was going down, and that everybody else was saying they had paid Tyrone White, and that White had been caught. Mr. Pitts told Officer Holder that he had not given Tyrone White any money. Officer Holder told Mr. Pitts that he must have given White some money because you can not just make a DUI go away. Officer Holder went on to explain that he could make a truckload of cocaine disappear, but not a DUI.

When Mr. Pitts continued to deny he had given Tyrone White any money, Officer Holder got angry with him, and called Mr. Pitts a "G—damned Liar." Officer Holder went on to curse Mr. Pitts, telling Mr. Pitts that his "ass was going to prison." (N. Pitts, Tr. 2 at 103, 110; Def. Ex. 20 at Para. 10).

Mr. Pitts felt threatened by Officer Holder because he kept telling Mr. Pitts that he was going to lose his job with the City, where he had worked ten years. Officer Holder also kept telling Mr. Pitts that he would lose his house, among other things, including being able to support his two little children. (N. Pitts, Tr. 2 at 103, 111).

The second time Mr. Pitts was questioned, federal agents were there. Mr. Pitts continued to tell his questioners that he had never paid, nor did he owe, Tyrone White any money. (N. Pitts, Tr. 2 at 104). Mr. Pitts' grand jury testimony was the same, that he had not given, nor did he owe, anything to the defendant. (N. Pitts, Tr. 2 at 105).

### D. Government's Witnesses

The government called Attorney Gary Black, Monkevin Cobb, Edward Spencer, Jackie Vickers, and Federal agents Kelvin King, Paul Houston and Christian Deeb, as well as Auburn police officer Jerry Holder.

### 1. Gary Black

Attorney Gary Black testified very briefly about his involvement with the case, confirming that Shenard Pitts never gave the defendant any money for adjusting tickets. (Black, Tr. 2 at 128). Attorney Black, a 25 year veteran of the Auburn Police Department, also testified that it was not surprising at all that they would not let Shenard Pitts out of jail unless he cooperated, because "that is the way it works in our society." (Black, Tr. 2 at 127).

## 2. Monkevin Cobb

Monkevin Cobb, incarcerated on a firearm charge, admitted to having an extensive criminal record, and to being a habitual marijuana and cocaine user. (Cobb, Tr. 2 at 144, 147-148). Mr. Cobb further admitted that he had no proof, other than his bald statements, that the defendant had helped him with some charges. (Cobb, Tr. 2 at 148). Mr. Cobb has charges pending against him, and would be happy to accept favorable treatment (Cobb, Tr. 2 at 149).

## 3. Edward Spencer

The government called Edward Spencer, Jerry Stinson's employer, in an attempt to impeach Mr. Stinson on a few minor points, which are irrelevant to the instant motion.

## 4. Jacqueline Vikers

Jacqueline Vickers, the victim-witness coordinator for the United States Attorney's Office, testified why she arranged protective services for Daniel Todd.

## 5. Kelvin King

Agent Kelvin King testified that Jerry Stinson said he wanted to change his story because he "didn't want to face Mr. White." (King, Tr. 2 at 175). King interpreted this to mean that Stinson was afraid of the defendant, but Mr. Stinson explained what he meant in his affidavit and above, namely that he felt guilty for lying against the defendant.

Agent King also testified that he "typically does not record witness statements." (King, Tr. 2 at 181-183).

Also, Agent King indicated he is aware that what may be a "cordial conversation" to him may not be so cordial and may be a knee-knocking conversation for somebody on the other end of it. (King, Tr. 2 at 193).

### 6. Jerry Holder

Officer Jerry Holder met with Municipal Court Judge Joe Bailey, who allowed him to review court records and files. Judge Bailey gave Officer Holder a few cases he felt were suspicious, and that the defendant had been involved with. (Holder, Tr. 2 at 196). Holder admitted that officers do favors for people to have a charged reduced or dropped "just by asking the Judge to drop it or filling out a proper form, plea agreement type form." (Holder, Tr. 2 at 197-198).

Officer Holder revealed that he had relayed to Judge Bailey that Shenard Pitts had met with him and had given a statement, and then Judge Bailey arranged for his release. (Holder, Tr. 2 at 207). Officer Holder went on to say that he had met with Judge Bailey, and together they identified individuals who had worked out plea agreements with the defendant, and Judge Bailey had his clerk pull all of their court files. (Holder, Tr. 2 at 225).

Judge Bailey reviewed these files and found that a number of them were in violation of his previous orders, and the Judge issues writs and warrants on several individuals. (Holder, Tr. 2 at 211-212).

Officer Holder revealed possible bias against the defendant, who is black, when he admitted that he has heard the "N-word" being used around the department, and that he had done nothing to stop it. (Holder, Tr. 2 at 229).

Further, Officer Holder admits to cursing Norman Pitts, but does not feel it is intimidating for an Auburn police officer to curse someone. (Holder, Tr. 2 at 257-258).

Finally, Officer Holder stated that he never records statements. (Holder, Tr. 2 at 261).

### 7. Paul Houston and Christian Deeb

The government called federal agents Houston and Deeb to testify that they had a friendly lunch with some grand jury witnesses, and that at some points or another, they though certain witnesses were afraid. These factual issues are properly for the Court to consider based on all the evidence, and do not warrant further discussion here.

### IV. SUMMARY OF ARGUMENT

The Auburn Police Department and the Federal Bureau of investigation engaged in outrageous conduct during the investigation of Tyrone White – conduct which shocks the conscience and violates the defendant's Fifth Amendment Right to Due Process of Law. The government has preyed upon and taken advantage of the most vulnerable among us, most of whom have limited education and who have long been given reason to fear the establishment.

The Draconian methods employed by the government in this case are shameful and embarrassing to the City of Auburn, the State of Alabama and the United States of America. As a matter of policy, how can the United States of America preach enlightenment and human rights abroad when our government is coercing testimony through imprisonment and threats right here at home?

Further, it cannot be argued that the government's misconduct was without prejudice to the defendant, for the misconduct itself resulted in the evidence used by the grand jury to return the indictment in this case. But for the coerced statements, this defendant would not be a defendant at all. But for the coerced statements, this defendant would still have his job, his liberty and his dignity. The prejudice is total, and directly a result of government misconduct.

Additionally, although the United States Attorney's Office may not be directly involved in coercing testimony, the Federal Bureau of Investigation and the Auburn Police Department were acting as agents of the United States in investigating an alleged crime. The United States knew, or should have known, what kind of investigative tactics were being used, and cannot hide under a shield of ignorance and then reap the benefits of outrageous misbehavior.

Also, the government must not profit from the violation of civil rights and due process. The coerced statements and testimony resulted in an indictment. Therefore, the proper remedy is to vacate the indictment with prejudice, to prevent others from so abusing the justice system.

Finally, the government has an affirmative duty of good faith, to the Court and grand jury. Upon learning the grand jury testimony was false, the United States Attorney had a duty to disclose this fact to the Court and the grand jury, and to remedy the situation if possible.

## V. STANDARD OF REVIEW

### A. Outrageous Conduct

When the government's conduct during an investigation is sufficiently outrageous, the courts will not allow the government to prosecute offenses developed through that conduct. A defendant may challenge such conduct by means of the "outrageous conduct defense," which is predicated on the Due Process Clause of the Fifth Amendment to the United States Constitution. U.S. Const. Amend. V.

The appellate court reviews *de novo* the district court's denial of a motion to dismiss for outrageous government conduct that rises to the level of a due process

violation, and the appellate court reviews for an abuse of discretion the district court's refusal to exercise its supervisory powers to dismiss an indictment because of outrageous government conduct. See <u>United States v. Gurolla</u>, 333 F.3d 944, 950 (9th Cir.), cert. denied, 540 U.S. 995, 157 L. Ed. 2d 395, 124 S. Ct. 496 (2003), and <u>United States v. Garza-Juarez</u>, 992 F.2d 896, 903 (9th Cir. 1993).

The outrageous conduct defense was first enunciated in <u>United States v. Russell</u>, 411 U.S. 423, 36 L. Ed. 2d 366, 93 S. Ct. 1637 (1973). **"We may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction…"** <u>Id</u>. at 431-32 (citing <u>Rochin v. California</u>, 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205 (1952)).

Several years later, in <u>Hampton v. United States</u>, 425 U.S. 484, 48 L. Ed. 2d 113, 96 S. Ct. 1646 (1976), a majority of Justices left open the possibility that an outrageous conduct defense based on the Due Process Clause might be invoked successfully even if the entrapment defense is unavailable because of predisposition. <u>Id</u>. at 495 (Powell, J. with Blackmun, J., concurring); id. at 496-97 (Brennan, J., with Stewart & Marshall, JJ., dissenting). Whereas, the entrapment defense looks to the defendant's state of mind to determine predisposition, **the outrageous conduct defense looks at the government's behavior.** See <u>United States v. Gamble</u>, 737 F.2d 853, 858 (10th Cir. 1984).

Notwithstanding the lack of clear holding on outrageous conduct by the Supreme Court, most of the circuits, including this one, have recognized the viability of the outrageous conduct defense, and no circuit has denied the viability of this defense. Thus, outrageous conduct is a viable defense.

In evaluating claims that official conduct rose to a constitutionally impermissible level, the cases turn on the totality of the circumstances with no single factor controlling. United States v. Gianni, 678 F.2d 956, 960 (11th Cir. 1982), citing United States v. Tobias, 662 F.2d 381, 387 (5th Cir. 1981). Measured under this standard, Government involvement in criminal activity constitutes a due process violation where it violates "fundamental fairness, shocking to the universal cause of justice." United States v. Gianni, 678 F.2d 956, 960 (11th Cir. 1982), citing United States v. Russell, 411 U.S. at 432, 93 S. Ct. at 1643, quoting Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 246, 80 S. Ct. 297, 303, 4 L. Ed. 2d 268 (1960).

**Fundamental fairness will not permit any defendant to be convicted of a crime in which police conduct was "outrageous."** United States v. Twigg, 588 F.2d 373, 379 (3d Cir. 1978), citing United States v. Prairie, 572 F.2d 1316, 1319 (9th Cir. 1978); United States v. Johnson, 565 F.2d 179, 181 (1st Cir. 1977).

### B. Prosecutorial Misconduct

To establish a fifth amendment violation based on prosecutorial misconduct before the grand jury, a defendant must show actual prejudice. United States v. Griffith, 756 F.2d 1244, 1249-1250 (6th Cir. 1985).

Dismissal of the indictment based on the prosecutor's misconduct before the grand jury is warranted only where the misconduct "undermined the grand jury's ability to make an informed and objective evaluation of the evidence presented to it." United States v. Sears, Roebuck & Co., 719 F.2d 1386, 1391 (9th Cir. 1983), cert. denied, 465 U.S. 1079, 104 S. Ct. 1441, 79 L. Ed. 2d 762 (1984). In other words, dismissal is inappropriate unless the misconduct resulted in prejudice to the accused. Id. at 1392.

Further, it is well established that prosecutors have a duty of good faith with respect to the court, the grand jury, and the defendant. **The Due Process Clause of the Fifth Amendment is violated when a defendant is forced to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached.**

## V. ARGUMENT

### A. Outrageous Conduct

**1. Due process requires that an indictment based on coerced testimony be dismissed.**

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation. Unites States Constitution, Amend. 5.

Regard for the requirements of the Due Process Clause "inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings [resulting in a conviction] in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." Malinski v. New York, supra, at 416-417.

Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are "**so**

**rooted in the traditions and conscience of our people as to be ranked as fundamental**," <u>Snyder v. Massachusetts</u>, 291 U.S. 97, 105, or are "**implicit in the concept of ordered liberty**." <u>Palko v. Connecticut</u>, 302 U.S. 319, 325.

According to Justice Powell:

> Due process in essence means fundamental fairness, and the Court's cases are replete with examples of judgments as to when such fairness has been denied an accused in light of all the circumstances. . . . The fact that there is sometimes no sharply defined standard against which to make these judgments is not itself a sufficient reason to deny the federal judiciary's power to make them when warranted by the circumstances. . . . Nor do I despair of our ability in an appropriate case to identify appropriate standards for police practices without relying on the "chancellor's" "fastidious squeamishness or private sentimentalism." <u>Hampton v. United States</u>, supra, 425 U.S. at 494-95 n. 6, 96 S. Ct. at 1652 n. 6 (Powell, J., concurring).

The outrageous conduct defense first emerged in <u>Rochin v. California</u>, 342 U.S. 165, 169 (U.S. 1952), where the Supreme Court stated that, "Applying these general considerations to the circumstances of the present case, we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combating crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents -- this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation." <u>Rochin v. California</u>, 342 U.S. 165, 169 (U.S. 1952)

To attempt in this case to distinguish "real evidence" from verbal evidence is to ignore the reasons for excluding coerced confessions. Use of involuntary verbal confessions in State criminal trials is constitutionally obnoxious not only because of their unreliability. They are inadmissible under the Due Process Clause even though statements contained in them may be independently established as true. **Coerced statements offend the community's sense of fair play and decency**. Rochin v. California, 342 U.S. 165, 173-174 (U.S. 1952)

> It has long since ceased to be true that due process of law is heedless of the means by which otherwise relevant and credible evidence is obtained. This was not true even before the series of recent cases enforced the constitutional principle that the States may not base convictions upon confessions, however much verified, obtained by coercion. These decisions are not arbitrary exceptions to the comprehensive right of States to fashion their own rules of evidence for criminal trials. They are not sports in our constitutional law but applications of a general principle. They are only instances of the general requirement that States in their prosecutions respect certain decencies of civilized conduct. Due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend "a sense of justice." Chief Justice Hughes, speaking for a unanimous Court in Brown v. Mississippi, 297 U.S. 278, 285-286.

"**This court cannot "shirk the responsibility that is necessarily in its keeping . . . to accommodate the dangers of overzealous law enforcement and civilized methods adequate to counter the ingenuity of modern criminals.**" Sherman v. United States, 356 U.S. 369, 381, 78 S. Ct. 819, 825, 2 L. Ed. 2d 848 (1958) (Frankfurter, J., concurring in result). "**Prosecutors and their agents naturally tend to assign great weight to the societal interest in apprehending and convicting criminals; the danger**

is that they will assign too little to the rights of citizens to be free from government-induced criminality." United States v. Twigg, 588 F.2d 373, 380 (3d Cir. 1978), citing United States v. Archer, 486 F.2d 670, 677 (2d Cir. 1973) (Friendly, J.).

"It would be a stultification of the responsibility which the course of constitutional history has cast upon this Court to hold that in order to convict a man the police cannot extract by force what is in his mind but can extract what is in his stomach." Rochin v. California, 342 U.S. 165, 172-173 (U.S. 1952). Similarly, to extract testimony by imprisonment or threat of imprisonment is clearly repugnant to the Constitution and cannot be tolerated.

**2. As the name of the defense implies, to warrant dismissal of an indictment, the government's conduct with respect to that indictment must be outrageous.** Outrageousness must be determined by reference to "the universal sense of justice." See United States v. Russell, 411 U.S. 423, 432 (1973).

The government's conduct warrants dismissal of the indictment if "that conduct is so excessive, flagrant, scandalous, intolerable and offensive as to violate due process." United States v. Mercado, 110 Fed. Appx. 19, 22 (9th Cir. 2004), citing Garza-Juarez, 992 F.2d at 904; see also Gurolla, 333 F.3d at 950 ("outrageous government conduct is limited to extreme cases in which the government's conduct violates fundamental fairness and is shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment.") (internal quotation marks omitted).

**3. Although high, the burden to prove outrageous conduct is not impossible.** Federal Courts have dismissed indictments for outrageous conduct by the government. McIntyre v. United States, 336 F. Supp. 2d 87, 117 (D. Mass. 2004), citing, e.g., United

States v. Bogart, 783 F.2d 1428, 1432-34 (9th Cir. 1986) (holding that criminal defendant had made a sufficient showing of government "outrageous conduct" to require the district court to make finding of facts on whether prosecution would violate the defendant's due process rights), vacated in part as to other defendant in United States v. Wingender, 790 F.2d 802 (9th Cir. 1986); United States v. Sabri, 973 F. Supp. 134, 139 (W.D.N.Y. 1996) (granting motion to dismiss indictment where government had used defendant's attorney in informant-like role to investigate defendant's possible criminal activity; as government agent, attorney's conduct was attributable to the government); United States v. Gardner, 658 F. Supp. 1573, 1574, (W.D. Pa. 1987) (dismissing indictment because government informant's "outrageous conduct" in manipulating criminal defendant into acquiring cocaine for the informant violated defendant's due process rights and barred the government from seeking a conviction; citing Sherman in finding that the informant was an agent of the government, and citing United States v. Twigg, 588 F.2d 373 (3d Cir. 1978), finding that "the government initiated and was actively involved in the criminal enterprise itself); United States v. Batres-Santolino, 521 F. Supp. 744, 751 n.4 (N.D. Ca. 1981) (dismissing indictment based on government informant's outrageous conduct; noting that government "wisely" did not argue that informant's conduct could not be attributed to government); cf. United States v. Merlino, 2000 WL 294880, at *2 (D. Mass. Mar. 10, 2000) (recognizing that government's outrageous conduct in using informant to investigate criminal activity can violate a defendants due process rights and bar the government from seeking a conviction) (Stearns, J.); United States v. Ayyub, 998 F. Supp. 81, 83-84 (D. Mass. 1998) (same).

**4. Under the requirements of the outrageous conduct defense, the Court must consider the totality of the circumstances in any given case.** See United States v. Bogart, 783 F.2d 1428, 1438 (9th Cir.) ("Ultimately, every [outrageous conduct] case must be resolved on its own particular facts."), vacated in part on other grounds sub nom. United States v. Wingender, 790 F.2d 802 (9th Cir. 1986). In determining whether such conduct exists, the "totality of the circumstances" must be considered "with no single factor controlling."

**5. To warrant dismissal of an indictment, as the name of the defense implies, the government's conduct with respect to that indictment must be outrageous.** Outrageousness must be determined by reference to "'the universal sense of justice.'" United States v. Mosley, 965 F.2d 906, 910 (10th Cir. 1992), citing Russell, 411 U.S. at 432 (quoting Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 246, 4 L. Ed. 2d 268, 80 S. Ct. 297 (1960)).

Although the requirement of outrageousness has been stated in several different ways by various courts, the thrust of each of these analyses is that the challenged conduct must be shocking, outrageous, and clearly intolerable. United States v. Mosley, 965 F.2d 906, 910 (10th Cir. 1992), citing, e.g., Russell, 411 U.S. at 432 (conduct must violate "'fundamental fairness'" or "'shock the universal sense of justice,'") (quoting Kinsella, 361 U.S. at 246); Nichols, 877 F.2d at 827 (conduct must be "shocking and outrageous and reach an 'intolerable level'") (quoting Russell, 411 U.S. at 431-32); United States v. Ryan, 548 F.2d 782, 789 (9th Cir.) (conduct must be "so grossly shocking and so outrageous as to violate the universal sense of justice"), cert. denied, 429 U.S. 939 (1976), and cert. denied, 430 U.S. 965, 52 L. Ed. 2d 356, 97 S. Ct. 1644 (1977).

To constitute a constitutional violation the law enforcement technique must be so outrageous that it is fundamentally unfair and "shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment." <u>Russell</u> at 432, 93 S. Ct. at 1643.

**6. The totality of the circumstances presented in this case reveal actions of the government so outrageous as to "shock the universal sense of justice."** The methods employed by law enforcement in the investigation of this case – threatening and imprisoning citizens of Auburn who may not be sophisticated or well versed in their Civil Rights, and may very well have good reason to fear the police – are Draconian and shock the universal sense of justice.

We do not live in a police state, where citizens must live in constant fear of harassment and incarceration if we do not cooperate with the government's agenda. We live in the United States of America, a nation founded on personal liberty and due process, both casualties laid by the wayside in the government's over-zealous persecution of a man who was only trying to stand up for his fundamental right to work in an environment free from racial animus.

The evidence has shown that law enforcement agents, acting on behalf of the United States, intimidated and coerced statements from individuals with selective prosecution and wrongful imprisonment. Individuals were threatened not only with loss of liberty, but with embarrassment and loss of income.

This behavior shocks the conscience, and warrants dismissal of the entire indictment, not only the four counts shown by the evidence to be based on false

statements. All counts of the indictment are badly tainted by the conduct of the investigators in this case, and are due to be dismissed.

## B. Prosecutorial Misconduct

**1. Whenever the prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel -- and, if the perjury may be material, also the grand jury -- in order that appropriate action may be taken.** See Mooney v. Holohan, 294 U.S. 103, 79 L. Ed. 791, 55 S. Ct. 340 (1935); Giles v. Maryland, 386 U.S. 66, 17 L. Ed. 2d 737, 87 S. Ct. 793 (1967); Napue v. Illinois, 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959); Alcorta v. Texas, 355 U.S. 28, 2 L. Ed. 2d 9, 78 S. Ct. 103 (1957); Hysler v. Florida, 315 U.S. 411, 86 L. Ed. 932, 62 S. Ct. 688 (1942); Pyle v. Kansas, 317 U.S. 213, 87 L. Ed. 214, 63 S. Ct. 177 (1942).

The Court held in Napue v. Illinois, 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959), that the prosecution's use of known false testimony at trial required a reversal of the petitioner's conviction. The same result must follow when the government allows a defendant to stand trial on an indictment which it knows to be based in part upon perjured testimony.

**The consequences to the defendant of perjured testimony given before the grand jury are no less severe than those of perjured testimony given at trial, and in fact may be more severe. The defendant has no effective means of cross-examining or rebutting perjured testimony given before the grand jury, as he might in court.**

In Mesarosh v. United States, 352 U.S. 1, 1 L. Ed. 2d 1, 77 S. Ct. 1 (1956), while a review of the petitioners' convictions was pending in the Supreme Court, the Solicitor

General informed the Court of indications he had just received that one of the government's witnesses at trial had testified falsely in other proceedings. While the government believed that the witness' testimony at trial "was entirely truthful and credible, " it suggested a remand to the district court for a determination of the credibility of the witness' testimony. Solely on the basis of the government's representations, the Supreme Court reversed the convictions and directed that petitioners be granted a new trial. The Court stated, inter alia, that "**[the witness], by his testimony, has poisoned the water in this reservoir, and the reservoir cannot be cleansed without first draining it of all impurity. . . . Pollution having taken place here, the condition should be remedied at the earliest opportunity.**"

**2. Permitting a defendant to stand trial on an indictment which the government knows is based on perjured testimony cannot comport with this "fastidious regard for the honor of the administration of justice."** 352 U.S. at 14. See also, United States v. Basurto, 497 F.2d 781, 785-787 (9th Cir. 1974), (where appellants' convictions were reversed because the prosecuting attorney did not take appropriate action to cure the indictment upon discovery of the perjured grand jury testimony.)

**"The untainted administration of justice is certainly one of the most cherished aspects of our institutions.** Its observance is one of our proudest boasts. . . Fastidious regard for the honor of the administration of justice requires the Court to make certain that the doing of justice be made so manifest that only irrational or perverse claims of its disregard can be asserted." Communist Party v. Subversive Activities Control Board, 351 U.S. 115, 124, 100 L. Ed. 1003, 76 S. Ct. 663.

**3. The due process clause of the Fifth Amendment is violated when a defendant must stand trial on an indictment that the government knows is partially based upon perjured testimony that was material in nature**. United States v. Traylor, 656 F.2d 1326, 1334 (9th Cir. 1981), citing United States v. Basurto, 497 F.2d 781, 785 (9th Cir. 1974); United States v. Bracy, 566 F.2d 649, 654 (9th Cir. 1977), cert. denied, 439 U.S. 818, 99 S. Ct. 79, 58 L. Ed. 2d 109 (1978).

**4. Criminal convictions have been reversed in a number of cases as a result of prosecutorial or judicial interference with the testimony of a defense witness.** United States v. Heller, 830 F.2d 150, 152-153 (11th Cir. 1987), citing Webb v. Texas, 409 U.S. 95, 34 L. Ed. 2d 330, 93 S. Ct. 351 (1972) (where trial judge singled out a sole defense witness and admonished the witness at length as to the dangers of perjury and the witness thereafter refused to testify on behalf of the defense, defendant was deprived due process of law); United States v. Hammond, 598 F.2d 1008 (5th Cir. 1979) n2 (holding that government statement to a witness that they would have "nothing but trouble" if they testified on behalf of defense requires reversal); United States v. Morrison, 535 F.2d 223 (3d Cir. 1976) (prosecutor who pointedly warned defense witness of the dangers of testifying falsely in favor of the defendant, inducing witness to refuse to answer certain questions on the ground that the answers might incriminate her, deprived defendant of evidence he expected to place before the jury and therefore denied him his Sixth Amendment rights); United States v. Thomas, 488 F.2d 334 (6th Cir. 1973) (government's threat to prosecute a witness if he chose to testify could not later be corrected by mere statement by the government that they would not prosecute the witness).

**5. Under certain circumstances, intimidation or threats that dissuade a potential defense witness from testifying may infringe a defendant's due process rights**. United States v. Pinto, 850 F.2d 927, 932 (2d Cir. 1988), citing, e.g., Webb v. Texas, 409 U.S. 95, 98, 34 L. Ed. 2d 330, 93 S. Ct. 351 (1972) (judge's unnecessary harangue of defendant's sole witness drove witness from the stand); United States v. Morrison, 535 F.2d 223, 228 (3rd Cir. 1976) (prosecutor's intimidating interview of witness before start of defense case and indirect warnings concerning potential criminal liability dissuaded witness from testifying). The circumstances will warrant reversal only if the government's conduct interfered substantially with a witness's "free and unhampered choice" to testify. United States v. Goodwin, 625 F.2d 693, 703 (5th Cir. 1980).

**That interference may involve threats of prosecution**, e.g., United States v. Smith, 156 U.S. App. D.C. 66, 478 F.2d 976, 979 (D.C. Cir. 1973), or other intimidating conduct, see, e.g., United States v. MacCloskey, 682 F.2d 468, 479 (4th Cir. 1982) (prosecutor's "eleventh hour" telephone call to witness's attorney reminding him of potential fifth amendment problem if witness took stand), that was designed to intimidate, see, e.g., United States v. Whittington, 783 F.2d 1210, 1219 (5th Cir.), cert. denied, 479 U.S. 882, 107 S. Ct. 269, 93 L. Ed. 2d 246 (1986); United States v. Little, 753 F.2d 1420, 1440 (9th Cir. 1984).

A court also will look to factors beyond the government's control to determine whether a witness's decision not to testify resulted from the government's conduct, cf. United States ex rel. Jones v. DeRobertis, 766 F.2d 270, 274-75 (7th Cir. 1985) (witness apparently thought that petitioner's claim was meritless and "feared prosecution for

perjury"), cert. denied sub nom. Jones v. DeRobertis, 475 U.S. 1053, 106 S. Ct. 1280, 89 L. Ed. 2d 587 (1986).

6. All eleven witnesses called by the defense at the evidentiary hearing testified that they felt threatened or coerced. This intimidation coerced many of these individuals into giving false statements. **Witness tampering by the government violates the defendant's due process rights under the Constitution** and cannot go uncorrected by this Court. As agents of the government, all actions undertaken by the Auburn police and federal agents in investigating this case, must be imputed to the prosecutor's office, at whose behest and for whose benefit these agents worked.

### C. Dismissal

**1. Federal courts have a general supervisory power with respect to the administration of justice in federal judicial proceedings.** See United States v. Hasting, 461 U.S. 499, 505, 76 L. Ed. 2d 96, 103 S. Ct. 1974 (1983); United States v. Payner, 447 U.S. 727, 734 - 36, n.8, 65 L. Ed. 2d 468, 100 S. Ct. 2439, reh'g denied, 448 U.S. 911, 65 L. Ed. 2d 1172, 101 S. Ct. 25 (1980); McNabb v. United States, 318 U.S. 332, 87 L. Ed. 819, 63 S. Ct. 608, reh'g denied, 319 U.S. 784, 87 L. Ed. 1727, 63 S. Ct. 1322 (1943); see generally Beale, Reconsidering Supervisory Power in Criminal Cases; Constitutional and Statutory Limits on the Authority of the Federal Courts, 84 Colum. L. Rev. 1433 (1984).

The use of the supervisory power supports three institutional goals: (1) deterring illegal conduct by government officials, (2) protecting and preserving the integrity of the judicial process, and (3) implementing a remedy for violation of recognized rights. See United States v. Hasting, 461 U.S. at 505; United States v. Payner, 447 U.S. at 735 n.8;

Note, The Exercise of Supervisory Powers to Dismiss a Grand Jury Indictment -- A Basis for Curbing Prosecutorial Misconduct, 45 Ohio St. L. J. 1077, 1084 (1984).

**2.    Courts have dismissed criminal prosecutions because of serious government abuse in the investigation leading to the indictment**. See United States v. Kilpatrick, 594 F. Supp. 1324, 1352-53 (D. Col. 1984); United States v. Lawson, 502 F. Supp. 158, 170 (D. Md. 1980); United States v. Dahlstrum, 493 F. Supp. 966, 974-75 (C.D. Cal. 1980), appeal dismissed, 655 F.2d 971 (9th Cir. 1981), cert. denied, 455 U.S. 928, 71 L. Ed. 2d 472, 102 S. Ct. 1293 (1982).

Moreover, courts have dismissed indictments because of serious government misconduct following the indictment. See United States v. Pollock, 417 F. Supp. 1332, 1348-49 (D. Mass. 1976); United States v. DeMarco, 407 F. Supp. 107, 115 (C.D. Cal. 1975); United States v. Banks, 383 F. Supp. 389, 397 (D.S.D. 1974), appeal dismissed sub nom. United States v. Means, 513 F.2d 1329 (8th Cir. 1975).

3.    **If the defendants demonstrate actual prejudice, the indictment can be dismissed under the supervisory power.** See, e.g., United States v. McKenzie, 678 F.2d 629, 631 (5th Cir.), reh'g denied, 685 F.2d 1386 (5th Cir.), cert. denied, 459 U.S. 1038, 74 L. Ed. 2d 604, 103 S. Ct. 450 (1982); United States v. Nembhard, 676 F.2d 193, 200 (6th Cir. 1982). The following courts have concluded that an indictment can be dismissed even in the absence of prejudice, in extreme circumstances. See, e.g., United States v. Serubo, 604 F.2d 807, 817 (3d Cir. 1979); United States v. McCord, 166 U.S. App. D.C. 1, 509 F.2d 334, 349 (D.C. Cir. 1974), cert. denied, 421 U.S. 930, 44 L.  [**76]  Ed. 2d 87, 95 S. Ct. 1656 (1975). The Eleventh Circuit has not yet determined whether prejudice is required. See United States v. Pabian, 704 F.2d 1533, 1540 (11th Cir. 1983).

The supervisory power may be invoked in many situations based on the peculiar circumstances presented. It should be exercised sparingly and only on a showing of demonstrated and long standing prosecutorial misconduct, See United States v. Adamo, 742 F.2d 927, 942 (6th Cir. 1984), cert. denied sub nom. Freeman v. United States, 469 U.S. 1193, 105 S. Ct. 971, 83 L. Ed. 2d 975 (1985), just as reversals of convictions under the supervisory power must be approached "with some caution." United States v. Hasting, 461 U.S. at 506 - 07. See also United States v. Artuso, 618 F.2d 192, 196 - 97 (2d Cir.), cert. denied 449 U.S. 861, 66 L. Ed. 2d 77, 101 S. Ct. 164, 449 U.S. 879, 101 S. Ct. 226, 66 L. Ed. 2d 102 (1980); United States v. Fields, 592 F.2d 638, 648 (2d Cir. 1978), cert. denied, 442 U.S. 917, 61 L. Ed. 2d 284, 99 S. Ct. 2838 (1979).

"Sparing" use, of course, does not mean "no" use. Even "disfavored remedies", United States v. Rogers, 751 F.2d at 1076-77, must be used in certain situations. Exercising the inherent authority is most appropriate in particular fact situations that do not lend themselves to rules of general application. United States v. Harrison, 716 F.2d 1050, 1053 n.1 (4th Cir. 1983), cert. denied sub nom. Wissler v. United States, 466 U.S. 972, 80 L. Ed. 2d 819, 104 S. Ct. 2345 (1984).

**4. In many decisions is that the magnitude of the misconduct affects the use of the supervisory power, whether or not actual prejudice is shown.** See, e.g., United States v. Serubo, 604 F.2d at 818 (prosecutorial conduct extreme; graphic and misleading reference by prosecution to Cosa Nostra hatchet men); United States v. Hogan, 712 F.2d 757 (2d Cir. 1983) (misconduct flagrant); United States v. Fischbach & Moore, Inc., 576 F. Supp. 1384, 1396 (W.D. Pa. 1983) (isolated incident of misconduct).

**5. In determining the proper remedy pursuant to the supervisory power, the relief chosen should be directly related to the seriousness of the misconduct.** United States v. Banks, 383 F. Supp. at 392. Repeated instances of deliberate and flagrant misconduct justify dismissal of the indictment. See Id.; United States v. Hogan, 712 F.2d at 761; United States v. Kilpatrick, 594 F. Supp. at 1352 - 53; United States v. Lawson, 502 F. Supp. at 172.

In this case, where the government imprisoned or threatened to prosecute and harassed citizens to coerce them to testify, all with the help of the courts, the seriousness of the misconduct is of utmost seriousness. Therefore, the only adequate remedy is complete dismissal of the entire indictment.

**6. The supervisory power must be used for "conduct that shocks the conscience."** In light of the Supreme Court's general statements concerning the purpose for which the supervisory power was created and that Court's sensitivity to the need to invoke the doctrine to promote fairness and assure justice, the supervisory power must be utilized in this case. **Utilization of the supervisory power remains a harsh ultimate sanction, but must be used for "conduct that shocks the conscience."** United States v. Baskes, 433 F. Supp. 799, 806 (N.D. Ill. 1977) (quoting Rochin v. California, 342 U.S. 165, 172, 96 L. Ed. 183, 72 S. Ct. 205 (1952)).

The misconduct here is as extreme as any found in the reported decisions on this topic. The defendant and the Court clearly suffered prejudice from the misconduct. Whether or not there is prejudice, the supervisory power to have any significance must be applicable to cases of repeated, flagrant governmental misconduct. In light of all the

testimony presented at the evidentiary hearing, it is clear that this case rises to the high threshold imposed for invocation of the supervisory power.

**This Court cannot stand idly by, implicitly joining the federal judiciary into such unbecoming conduct.** United States v. Omni International Corp., 634 F. Supp. 1414, 1436-1439 (D. Md. 1986)

**7. The government has placed the integrity of the criminal justice system in jeopardy.** The facts of each case determine when government conduct has placed in jeopardy the integrity of the criminal justice system. United States v. Samango, 607 F.2d 877, 884 (9th Cir. 1979). The government by its actions in this case, has severely damaged the credibility of the entire criminal justice system, by perverting the system itself and coercing falsehoods from people to build their case against the defendant.

**Further, at the point at which he learned of the perjury before the grand jury, the prosecuting attorney was under a duty to notify the court and the grand jury, to correct the "cancer of justice" that had become apparent to him.** To permit the defendants to stand trial when the prosecutor knew of the perjury before the grand jury only allowed the cancer to grow. United States v. Basurto, 497 F.2d 781, 785 (9th Cir. 1974)

**A district court does have the power to dismiss an indictment based on prosecutorial misconduct.** This power is limited, and a harmless-error inquiry applies to claims of prosecutorial misconduct before a grand jury. There must be a showing of actual prejudice to the defendants. United States v. Breslin, 916 F. Supp. 438, 441 (D. Pa. 1996), citing Bank of Nova Scotia v. United States, 487 U.S. 250, 255-56, 101 L. Ed. 2d 228, 108 S. Ct. 2369 (1988).

There is "prejudice" only "'if it is established that the violation substantially influenced the grand jury's decision to indict' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." Id. (citing United States v. Mechanik, 475 U.S. 66, 78, 89 L. Ed. 2d 50, 106 S. Ct. 938 (1986).

As stated above, the defendant has clearly suffered actual prejudice because of government misconduct. But for the same, the defendant would not be a defendant at all. The grand jury's decision to indict the defendant was based solely on coerced statements, and the only adequate remedy is to dismiss the entire indictment with prejudice.

## VI. CONCLUSION

For the foregoing reasons, the defendant's Motion to Dismiss Indictment and for Sanctions should be GRANTED. Additionally, the Court should grant the other relief requested above.

RESPECTFULLY SUBMITTED this 9th day of January 2005.

TYRONE WHITE
Defendant

/s/ Julian L. McPhillips, Jr.
JULIAN L. MCPHILLIPS, JR.
Alabama Bar No. MCP004

/s/ Allison H. Highley
ALLISON H. HIGHLEY
Washington Bar No. 34145
Attorneys for Defendant
McPhillips Shinbaum, LLP
Post Office Box 64
Montgomery, Alabama 36101
(334) 262-1911

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this date, I served a copy of the foregoing via email and

U.S. Mail, first-class postage prepaid, to:

     Todd A. Brown, Esq.
     Assistant United States Attorney
     Post Office Box 197
     Montgomery, Alabama 36101-0197

                 /s/ Allison H. Highley
                 ALLISON H. HIGHLEY