**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CR. NO: 3:05-CR-0234-A** |
| | ) | |
| | ) | |
| **TYRONE WHITE** | ) | |

**GOVERNMENT'S BRIEF IN OPPOSITION OF
DEFENDANT'S MOTION TO DISMISS INDICTMENT AND FOR SANCTIONS**

COMES NOW the United States of America, by and through Leura Garrett Canary, United States Attorney for the Middle District of Alabama, and files the above-styled brief in opposition to Defendant's ("White's") Motion to Dismiss and for Sanctions (Doc. #39), as follows:

**STATEMENT OF THE ISSUES**

Whether the Indictment, or Counts therein, are due to be dismissed upon White's claim of "outrageous conduct" displayed by government agents?

Whether the Indictment, or Counts therein, are due to be dismissed upon White's claim of prosecutorial misconduct?

**STATEMENT OF THE CASE**

On October 4, 2005, a grand jury for the Middle District of Alabama returned an eight-count indictment against White, charging him with eight violations of the Hobbs Act, pursuant to 18 U.S.C. § 1951(a). (Doc. #1). On November 15, 2005, that same grand jury returned a nine-count superseding indictment, not materially altering the original indictment, but adding a count of witness tampering, pursuant to 18 U.S.C. § 1512(b)(3). (Doc. #43). Subsequently, White

filed a motion to dismiss the indictment and for unspecified sanctions. (Doc. #39). On November 30, December 7, and December 9, 2005, this Court heard evidence from both parties regarding White's motion. On January 10, 2006, pursuant to the order of this Court, White filed a post-hearing brief in support of his motion. (Doc. #110).

On January 20, 2006, another federal grand jury seated in this district, empanelled after the first superseding indictment was returned, returned an eight-count superseding indictment. (Doc. #117). This indictment is materially different from the original indictment and the first superseding indictment. Specifically, based on testimony from Mitchell Giles, Jerry Stinson, and Shenard Pitts, at the above-referenced evidentiary hearing, all counts of the original and first superseding indictments relating to these individuals were eliminated. Additionally, two more Hobbs Act counts were added based upon the testimony of Monkevin Cobb, elicited during the course of the above-referenced evidentiary hearing. Also, on January 20, 2006, that same federal grand jury returned indictments charging Mitchell Giles and Jerry Stinson with making false declarations before a grand jury or court, in violation of 18 U.S.C. § 1623. United States v. Giles, Cr. No. 2:05-CR-0016-A (MDAL); United States v. Stinson, Cr. No. 2:05-CR-0015-A (MDAL).

## STATEMENT OF THE FACTS

At some point, prior to the return of the original indictment, Lt. Jerry Holder and other members of the Auburn Police Department ("APD") began an investigation into allegations that White, himself an APD officer at the time, was inappropriately dealing with misdemeanor cases in Auburn Municipal Court. (R2:196).[1] Lt. Holder was asked to begin an internal investigation

---

[1] A transcript of each day's testimony was prepared following the hearing. For convenience, these transcripts will be referred to as follows: November 30 (R1); December 7

into these allegations, which he did. Id. Lt. Holder reviewed court records and files with Auburn Municipal Judge Joe Bailey and determined there were a number of discrepancies in cases involving White. Id. Afterwards, Lt. Holder and others interviewed every APD officer in the department and determined that because of the nature and extent of the investigation, assistance from the Federal Bureau of Investigation ("FBI") would be needed. (R2:199). After investigators identified quite a few people who had cases dismissed, dropped, or *nol prossed*, investigators interviewed some of those people. Id.

Lt. Holder interviewed some of these people personally, including Winfred White. (R2:200). Court records indicated that Winfred White had been involved in several arrests, including arrests for assaulting a police officer, resisting arrest, and a number of other charges. Id. Several of those charges had been *nol prossed* pursuant to an agreement reached after White came to the arresting officer and requested some of Winfred White's charges be dropped. Id. Lt. Holder recalled contacting Winfred White regarding these dropped charges at his place of business, and Winfred White agreed to come to the police department to discuss the matter. Winfred White came to the police department on his own, and after discussing the matter with investigators, left to return to work. (R2:200-01). Winfred White did not tell investigators that he had paid White anything in exchange for having his charges fixed. (R2:201).

Lt. Holder also interviewed Shenard Pitts, on two different occasions, on two separate dates. Id. On July 18, 2005, Pitts was in Auburn Municipal Court at a hearing in front of Judge Bailey when the judge called Lt. Holder and told him that he had some people in his courtroom who wanted to talk to investigators. Id. According to Judge Bailey, the individuals in question, including Pitts, had some information that they had not previously given to investigators that

(R2); and, December 9 (R3).

they now wished to provide. Id. On July 18, Pitts informed investigators that White had charges fixed for him, but that he had not paid White for that service. (R2:203). Pitts refused to take a polygraph test to confirm his story. (R2:204). Pitts was returned to the Auburn city jail, where he had been incarcerated. Id. On or about August 10, 2005, Lt. Holder again interviewed Pitts, after his attorney, Gary Black stated that he was representing Pitts and that Pitts wanted to speak with investigators for a third time. (R2:205). Because Pitts had already had two opportunities to give information to the investigators, Lt. Holder was reluctant to interview Pitts for a third time. Id. Nevertheless, on August 10, 2005, investigators took an oral statement from Pitts, which was later reduced to writing and which was signed by Pitts. (R2:206-07). Pitts told officers that he had, in fact, paid White $500 in exchange for having a gun charge dropped. (R1:145-148; Gov. Exhibit B).

Lt. Holder also interviewed Mitchell Giles ("Giles"). (R2:212). Giles came to the police department on his own, where he was interviewed. (R2:214). Giles admitted to investigators that White helped keep him out of jail on a previous trespassing charge in exchange for $300. (R1:213-216; R2:212-215).

Lt. Holder interviewed Norman Pitts during the investigation. (R2:217-18). Lt. Holder and Lieutenant Dawson ("Dawson") interviewed Norman Pitts at Dawson's residence. Id. Norman Pitts denied having paid White to have his DUI charges fixed. (R2:219).

Lt. Holder interviewed Daniel Todd ("Todd") during the White investigation. (R2:220). Todd told investigators that he paid White $1,000 to have a DUI charge dropped. (R2:220-21). Lt. Holder also interviewed Myrtis Henderson ("Henderson") and Donald Copeland ("Copeland"), both of whom denied paying White for favorable treatment in their misdemeanor cases. (R2:221-23).

4

Other investigators interviewed witnesses in the White investigation. FBI Special Agent ("SA") Kelvin King interviewed Jerry Stinson ("Stinson"), who stated he paid White $500 in exchange for not going to jail in some misdemeanor matters. (R1:192; R2:171-73). Also, Monkevin Cobb, although never having been interviewed by investigators in the White case, admitted that on two separate occasions he gave White money to help him out with criminal charges. (R2:136-144).

After the return of the first superseding indictment, White filed the motion to dismiss and for unspecified sanctions that is the genesis of this brief. Attached to White's motion were eleven affidavits, one each from Stinson, Shenard Pitts, Giles, Henderson, Willis Bass ("Bass"), Norman Pitts, Copeland, Winfred White, Recco Cobb, and Patrick Threat. (Doc. #39, Exhibits A-K).

Stinson testified, and his affidavit avers, that he never paid White for favorable treatment in his pending misdemeanor cases. (R1:32-33). This statement is in direct contradiction to statements made to investigators as well as testimony given under oath before the grand jury seated in this matter. (R1:50-58; Gov. Exhibit A). Stinson claims he was threatened into giving this testimony. (R1:41; Doc. #39, Exhibit A).

Shenard Pitts testified, and his affidavit claims, that he never gave White money to have charges fixed. (R1:110-11). Pitts' statement directly contradicted his prior statements to investigators. (R1:145-148; Gov. Exhibit B). Pitts alleges he lied so that he could get out of jail. (R1:86, 121). Likewise, Giles testified contrary to his prior statements to law enforcement and before a grand jury. (R1:231-40, Gov. Exhibit E). Giles alleges that he lied before the grand jury because he was coerced and did not want to spend the weekend in jail. (R1:193).

The remaining affidavits attached to White's motion are from individuals who claimed

that they were intimidated by investigators in this matter.  However, none of these witnesses ever told investigators that they paid White for assistance in fixing tickets, and White was not indicted on any charges stemming from any relationship these witnesses may have had with White.

## STANDARDS OF REVIEW/BURDENS OF PROOF

Measured under a totality of the circumstances "standard, Government involvement in criminal activity constitutes a due process violation only where it violates fundamental fairness, shocking to the universal cause of justice."  United States v. Gianni, 678 F.2d 956, 960 (11th Cir. 1982) (internal citations and quotations omitted).

In deciding whether an indictment is due to be dismissed for prosecutorial misconduct before a grand jury, a district court must determine whether there was misconduct and "ask whether the error before the grand jury substantially influenced the grand jury's decision to indict or whether there is grave doubt that that decision to indict was free from such substantial influence of such violations."  United States v. Vallejo, 297 F.3d 1154, 1165 (11th Cir. 2002) (internal citations and quotations omitted).

## SUMMARY OF THE ARGUMENT

White's motion, particularly as it relates to counts regarding Stinson, Shenard Pitts, and Giles, as charged in Counts 1, 3, and 5, of the original and first superseding indictments, is moot. White is no longer charged with offenses related to anyone who claimed, by means of affidavit, to have been coerced into providing testimony against White.  (Doc. #117).  Thus, his motion is moot.

White has failed to meet the extremely high burden necessary to establish the agents' conduct in investigating this matter was "outrageous."

White's claim that the undersigned engaged in prosecutorial misconduct is without basis

6

in law or fact, it is moot, and otherwise without evidentiary support.

## ARGUMENT

### I.    WHITE'S MOTION IS MOOT WITH RESPECT TO COUNTS RELATED TO STINSON, SHENARD PITTS, AND GILES.

On January 20, 2006, the grand jury currently in session returned a second superseding indictment that did not include counts related to Jerry Stinson, Shenard Pitts, or Mitchell Giles. (Doc. #117).  Thus, as White is no longer charged with any count associated with a person who provided an affidavit claiming he or she gave coerced testimony, his entire motion is moot.

### II.    THE INDICTMENT IS NOT DUE TO BE DISMISSED UNDER A VAGUE OUTRAGEOUS CONDUCT DOCTRINE.

White attempts to bootstrap alleged misconduct committed by investigators in this case in an effort to argue that the due process clause demands that the entire indictment pending against him be dismissed because it is based on what he claims to be coerced testimony.  Def. Br. at 33, 34.    Thus, he claims, APD engaged in "outrageous conduct."  Def. Br. at 33, 34.  White correctly notes that there is a "lack of clear holding on outrageous conduct."  Id. at 31.

"The outrageous government conduct doctrine presents an extremely narrow opportunity for a defendant to challenge government conduct violating his due process rights."  United States v. Davis, 15 F.3d 1393, 1415 (7th Cir. 1994) (internal citations omitted).  The theory stems from dicta [and b]oth a plurality of the Supreme Court and [the Seventh Circuit] have expressed doubt as to the viability of the doctrine."  Id. (internal citations omitted).  "The limitations of the Due Process Clause of the Fifth Amendment come into play only when some Government activity in question violates some protected right of the Defendant."  Hampton v. United States, 425 U.S. 484, 490 (1976).  "While both the Supreme Court and [Eleventh Circuit] precedents have recognized the possibility that [a] conviction may be overturned where Government involvement

in criminal schemes is so extensive that it may be characterized 'outrageous', ...neither the Supreme Court nor the Fifth or Eleventh Circuits has reversed a conviction on that basis." Gianni, 678 F.2d at 959-60. (internal citations omitted). In fact, the vast majority of the reported cases, most originating out of the Ninth Circuit, involve cases involving entrapment claims.

White cites McIntyre v. United States, 336 F.Supp.2d 87, 117 (D.Mass. 2004) for the proposition that federal courts have dismissed indictments because of outrageous governmental conduct. Def. Br. at 36. Reliance on McIntyre is a bit misplaced, as it is a civil case addressing a Bivens claim wherein it is alleged that the conduct of an informant who killed another person was attributable to the government. Id. at 116-17. McIntyre is not a case addressing whether an indictment was dismissed. Id. In fact, the cases cited within note 25, to which White alludes, do not all involve cases where an indictment was dismissed. The first case cited within McIntyre is United States v. Bogart, 783 F.2d 1428, 1432-34 (9th Cir. 1986), which is also a case not dismissing an indictment. Rather, in an entrapment-related case, the Ninth Circuit remands the case to the district court to make factual findings and to apply them to established guidelines. Bogart, 783 F.2d at 1438. In remanding, the Ninth Circuit notes that only two circuits have dismissed an indictment in response to a due process outrageous governmental conduct defense. Id. at 1434. In giving examples of what might constitute an outrageous conduct defense, the court gave examples of "where government agents engineer and direct the criminal enterprise from start to finish or when governmental conduct constitutes in effect, the generation by police of new crimes merely for the sake of pressing criminal charges against the defendant." Id. at 1436 (internal citations omitted). A "crime manufactured by the government 'from whole cloth' would constitute outrageous conduct." Id.

Assuming *arguendo* that the affiants' testimony was coerced, the question becomes

whether that would constitute a due process violation of White's rights (which the Government does not concede) versus the rights of the affiants. Again, assuming White's due process rights can be violated by coercive conduct of others, the United States flatly rejects that the investigators coerced anyone's testimony in this matter, and the evidence at trial that any coercion occurred, is suspect at best. For example, Billy Smith, a private investigator hired by White, admitted that, in his experience as a licensed private investigator who trained under a 22-year veteran of the Montgomery Police Department, the serving of subpoenas would not be considered an act of witness intimidation. (R1:18-20). Much of what affiants to White's motion complain of is the serving of subpoenas upon them by APD officers and FBI agents. If the serving of subpoenas is to be construed as witness intimidation, then thousands of witnesses are intimidated across this country on a daily basis. Also, Smith stated that several witnesses warned him to "watch [his] back." (R1:20-21). When pressed to identify which witnesses stated this, he was able only to identify Stinson and Pitts. Id. Stinson, on direct examination by White's attorney, denied telling Billy Smith to "watch his back." (R1:71-72).

Stinson also had problems specifying just what he was supposedly threatened by. He stated that he lied so he would not go to jail, despite the fact that there was not outstanding warrant for his arrest. (R1:41). Stinson voluntarily rode from Auburn to Montgomery for the purpose of testifying before the grand jury. (R1:42). Police officers involved in the case did not drag Stinson to Montgomery. Id. And, although Stinson claimed that officers told him he "would get jammed up," he admitted that Agent King, who made the statement, may have meant that Stinson subjected himself to being "jammed up" if he gave contradictory statements to law enforcement. (R1:42-42). Stinson testified that he never pulled a federal agent aside to explain his alleged fear of APD investigators, although he was aware that he had no outstanding federal

warrant for his arrest. (R1:44-45). Nor did Stinson bring his alleged fears to Assistant United States Attorney Louis Franklin, who questioned Stinson in the grand jury, and spoke to him beforehand. (R1:46-47). Stinson never told Mr. Franklin or the grand jurors that he felt pressured into giving the testimony before the grand jury, even when confronted with a series of phone calls Stinson made to investigators allegedly to recant his earlier statements to them incriminating White. (R1:58-59). And, when explicitly given the opportunity to add or correct anything regarding his statement, he declined. (R1:57). Not only did Stinson talk to police officers on the day he went to grand jury, he actually joined the investigators for lunch. (R1:59-63). These are not the actions of one who is fearful or feels threatened.

Stinson is acquaintances with both APD Lt. Willie Smith ("Smith") and Smith's mother, both of whom he has known for fifteen years and grew up with. (R1:64-65). When investigators first approached Stinson, they asked his employer Edward Spencer ("Spencer") for permission to speak with Stinson. (R2:156-57). Spencer allowed it, never seeing officers threatening Stinson, and noting that aside from a little nervousness, Stinson appeared fine. (R2:158) Stinson never told Spencer that he was forced to make any statements by law enforcement, although Stinson had talked with him about his involvement with the White case. (R2:159, 161). Agent King testified that in his first encounter with Stinson, Stinson and Lt. Smith "talked about some family relations [and] they were like old friends." (R2:173) Agent King detected no nervousness from Stinson, that no one in his presence, including Lt. Smith, suggested what Stinson should say, and that no one made any kinds of threats toward him. (R2:174). In fact, the next day, it was White who Stinson identified as being the source of his fear, not law enforcement officers. (R2:176).

Shenard Pitts' story is similar. Pitts contends he was threatened because an abnormally high number of police vehicles showed up to serve Pitts with Violations of Court Orders

(VCOs). (R2:127). However, when pressed on this issue, Pitts had to admit that he was not present when this occurred, and he really did not know how many vehicles were present to serve him with VCOs. (R2:129-130). Pitts also admitted that his fear that he would be incarcerated because of pending fines had nothing to do with his possible cooperation against White. (R1:134). Pitts then made the highly implausible accusation that Municipal Judge Bailey would not accept over $2,000 in pending fines so that Pitts would remain in jail. (R1:135-36). Pitts testified that his lawyer, Gary Black, advised him to tell officers "whatever they wanted to hear," in relation to the White investigation. (R1:138). Mr. Black denied that happened. (R2:120). Lt. Holder testified that he never threatened Pitts with jail time or anything else to coerce him into giving information about White. (R2:204, 211). FBI SA Christian Deeb also testified that neither he nor anyone in his presence, including Lt. Smith, Lt. Holder, and Sergeant Chris Murray ("Murray"), threatened or coerced Pitts into making any statements incriminating White. (R2:275). Again, these facts fail to support the assertion that Pitts was fearful or threatened by APD or the FBI.

Mitchell Giles story follows this same pattern. Aside from Giles not remembering almost anything regarding his decision to change his testimony (R1:201-204), Giles major complaint was that law enforcement officers were coming to his mother's house. (R1:205). Giles admitted, though, that his mother's residence was his listed residence, and would be where one would go if he or she were looking for Giles. Id. Giles gave conflicting testimony regarding whether officers handed him a prepared statement to sign or if his statement was taken down while he gave it orally. (R1:207-210). Giles drove on his own to testify before the grand jury, bringing his cousin, Stinson. (R1:221; R2:216, 276). At the grand jury, Giles, like Stinson, never mentioned to the questioning prosecutor, Mr. Franklin, anything about being intimidated

by law enforcement into giving his testimony. (R1:224; R2:216). In fact, Giles was relaxed, sitting in the witness room joking with other witnesses. (R2:216). Giles voluntarily accompanied Stinson and the agents to lunch on the day of his grand jury testimony. (R1:239). Giles testified that he only called White once to thank him for helping him with his charges (R1:241); however, phone records showed multiple calls between Giles and White. (R2:276-81). Ultimately, Lt. Holder and Agent Deeb both testified that neither they nor anyone else in their presence threatened or coerced Giles into making incriminating statements against White. (R1:215, 276). Yet again, it is not readily apparent from Giles' behavior that he was scared or fearful of law enforcement.

Several other witnesses testified that they were intimidated by law enforcement (Adam Floyd, Winfred White, Myrtis Henderson, Donald Copeland, and Norman Pitts). However, none of these witnesses testified against, or gave incriminating statements about, White. Thus, any intimidation that these witnesses allegedly felt did not coerce them into making incriminating statements against White. And, while White called these witnesses to bolster the claim that law enforcement was engaging in coercive tactics, that claim is undercut by the testimony of Monkevin Cobb. (R2:132, et seq). Cobb gave testimony eerily similar to the incriminating statements given Stinson, Giles, and Shenard Pitts, but Cobb had never had any contact with the undersigned prosecutor or any of the investigators involved in the White case before the day he testified at the evidentiary hearing in this matter. (R2: 133, 143). Thus, it was impossible for Cobb to have been coerced by investigators in the White case into giving the testimony incriminating White. (R2:143).

If there was anyone involved in witness tampering in this cause, it was White himself. A grand jury has found probable cause to exist that White tampered with at least one witness.

(Doc. #117). Plus, a second witness, Daniel Todd, was so scared of White and his associates, that he contacted law enforcement and United States Attorney's office for protection. (R2:163, 266-68, 283-87). Mr. Todd told Jackie Vickers, the victim-witness coordinator with the U.S. Attorney's office, that he had been intimidated by other witnesses called by the defense and that he feared for his life to such a degree that he felt the need to obtain a firearm. (R2:164). This intimidation apparently had its intended effect—Daniel Todd began his testimony on December 7 by recanting his earlier statements to law enforcement. (R2:19, et seq). Mr. Todd ultimately decided it was best not to continue down that road and asked for the assistance of his attorney, ultimately deciding not to testify further. (R3).

Even in the Ninth Circuit, one of the few circuits to have ever dismissed an indictment based upon the outrageous conduct doctrine, posits that the doctrine is "limited to extreme cases in which the government's conduct violates fundamental fairness and is shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment." United States v. Gurolla, 333 F.3d 944, 950 (9th Cir. 2003) (internal citations and quotations omitted). "This standard is met when the government engineers and directs a criminal enterprise from start to finish." Id. (internal citations and quotations omitted). "Whether the government has stepped beyond permissible constitutional bounds in attempting to enforce the law is a legal question, not a factual one." Davis, 15 F.3d at 1415. There simply is no precedent in this, or any other circuit, that even if the officers had done as White claims, that such conduct violated the constitution as a matter of law. What the evidence has established, at most, is a controverted claim by White, and that of the government as to whom, if anyone, has intimidated witnesses. Such controversy is properly decided by a jury at trial.

### III.    WHITE'S PROSECUTORIAL MISCONDUCT CLAIM

**IS WITHOUT MERIT**

White claims the undersigned committed prosecutorial misconduct by not "immediately inform[ing] the court and opposing counsel" that alleged perjured testimony was presented to the grand jury in this matter. Def. Br. at 40. White contends that, in this case, he "has no effective means of cross-examining or rebutting the perjured testimony. Id. White claims that he should not be required to stand trial because the United States "knows [the indictment] is based on perjured testimony," or witness intimidation, and to require him to stand trial would violate his due process rights. Id. at 41-43. White, finally states that "[a]ll eleven witnesses called by the defense at the evidentiary hearing testified that they felt threatened or coerced." Id. at 44.

"In federal criminal prosecutions, the Fifth Amendment guarantees the right to indictment by an unbiased grand jury." United States v. Hyder, 732 F.2d 841, 842 (11th Cir. 1984). Dismissal of an indictment on grounds of prosecutorial misconduct before the grand jury is "an extreme sanction which should be infrequently utilized." Id. at 845, quoting United States v. Pabian, 704 F.2d 1533, 1535 (11th Cir. 1983). "A court may not dismiss an indictment, even for prosecutorial misconduct, without a showing that the violation substantially influenced the grand jury." United States v. Exarhos, 135 F.3d 723, 726 (11th Cir. 1998) (internal citations omitted). Cases warranting dismissal are "limited...to cases in which the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." Id, at 726-27 (internal citations omitted). Those rare circumstances include race and gender bias in the selection of the grand jury members. Id. at 727. The "district court must ask whether the error before the grand jury substantially influenced the grand jury's decision to indict or whether there is grave doubt that that decision to indict was free from such substantial influence of such violations." United States v. Vallejo, 297 F.3d 1154, 1165 (11th

Cir. 2002) (internal quotations and citations omitted).

In the instant cause, the only witnesses who testified before the grand jury which returned the original and first superseding indictment, who have also signed affidavits that they were coerced into given such testimony, are Jerry Stinson and Mitchell Giles. Whether or not "all eleven witnesses called by the defense" somehow felt threatened is immaterial and irrelevant. Aside from Stinson and Giles, none of the other affiants to White's motion testified before the grand jury, including Shenard Pitts. Nevertheless, neither Stinson nor Giles testified before the second set of newly empanelled grand jurors on January 20, 2006, those who returned the second superseding indictment (the one currently pending against White). Thus, as these counts are no longer pending against White, and because no witnesses giving conflicting, and possibly perjured testimony, have testified before the grand jury currently seated, White's motion is moot.

Further, it is the belief of the United States, based upon corroborating evidence and multiple statements given by Stinson and Giles to law enforcement, that their grand jury testimony was not perjured. It was there testimony at the hearing that was perjury. Because there is no evidence that the undersigned "prosecutor intentionally placed false testimony before the grand jury" there is no basis for dismissing this indictment on prosecutorial misconduct grounds. United States v. DiBerardo, 775 F.2d 1470, 1475 (11th Cir. 1985). And, for White to suggest he has no effective means to cross-examine witness is disingenuous at best. White had these very witnesses subpoenaed before this Court, where they testified.

## CONCLUSION

For the above reasons, the respectfully requests this Court to deny White's motion to

dismiss the indictment.[2]

      Respectfully submitted this the 30th day of January, 2006.

                      LEURA GARRETT CANARY
                      UNITED STATES ATTORNEY


                      /s/ Todd A. Brown
                      TODD A. BROWN
                      Assistant United States Attorney
                      Post Office Box 197
                      Montgomery, Alabama 36101-0197
                      (334) 223-7280
                      (334) 223-7135 fax
                      ASB-1901-O64T
                      Todd.Brown@usdoj.gov

---

[2] To date, White has not identified what sanctions he proposes this Court enter. For that reason, the United States does not address any portion of White's motion as it may relate to some unspecified sanction(s).

**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CR. NO: 3:05-CR-0234-A** |
| | ) | |
| **TYRONE WHITE** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on January 30, 2006, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

following: Julian McPhillips, Esquire.

Respectfully submitted,

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

/s/ Todd A. Brown
TODD A. BROWN
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
ASB-1901-O64T
Todd.Brown@usdoj.gov