IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | 3:05-CR-234-WHA |
| | ) | [wo] |
| | ) | |
| TYRONE WHITE | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

After considering written and oral submissions, including relevant testimony and exhibits admitted at an evidentiary hearing, the Magistrate Judge concludes that Defendant's *Motion to Dismiss and for Sanctions* (Doc. 39) is due to be dismissed.

### I.

### PROCEDURAL BACKGROUND

On October 4, 2005, the United States indicted former Auburn police officer Tyrone White ("White"), under 18 U.S.C. § 1915(a), for eight counts of demanding and accepting money from Auburn Municipal Court defendants in exchange for favorable treatment in connection with their pending cases. A superseding indictment filed on November 15 added a witness intimidation count in violation of 18 U.S.C. 1512(b)(3) (Doc. 43).

Before being served with the superseding indictment, White filed on November 16 the pending motion, buttressed by the affidavits of eleven witnesses who claim that "Auburn police officers [,purportedly "while acting as an arm of the Federal government in the prosecution of this case,"] coerced, or attempted to coerce, testimony from [them] that the witnesses had given [him]

money in exchange for [his] adjusting or disposing of outstanding tickets against them." (Doc. 39 ¶ 1 ). These witnesses included the following persons who provided grand jury testimony and were identified only by initials in both the original indictment and superseding indictment:  Jerry Stinson ("Stinson") (count 1), Shenard Pitts ("Pitts") (count 3), and Mitchell Giles ("Giles") (count 5). After the court granted the United States' motion to dismiss the October 4 indictment in response to  the November 15 indictment, White amended his dismissal motion to apply to the latter indictment.

At the evidentiary hearing on November 30,  the court received testimony from the same three witnesses – Stinson, Pitts, and Giles – and from the defendant's private investigator, Billy Smith. When the hearing resumed on December 7, the defense summoned as witnesses Daniel Todd, referenced as "D.T" in Count 2 of both indictments[1], along with all but two of the witnesses whose affidavits had been submitted with the dismissal motion:  Adam Floyd, Winfred White, Jr., Myrtis Henderson, Willis Edward Bass, Norman Pitts, and Donald Copeland.  Testifying for the United States were Gary Black, former attorney for Daniel Todd and Shenard Pitts; Monkevian  Cobb, an incarcerated felon; Edward Spencer, III, Stinson's employer; Jackie Vickers, a victim protection officer for the United States Attorney;  Auburn police officer Jerry Holder; and FBI agents Kelvin King, Paul Houston, and Christian Deeb.

Defendant White filed his  post-hearing brief on January 10, 2006 (Doc. 110), but prior to the January 30 filing of the United States' brief in opposition (Doc. 121), a second superseding

---

[1]Daniel Todd's reticence to testify on December 7 made it necessary to re-convene the evidentiary hearing in order to accommodate  his meeting with counsel; he returned with counsel at the scheduled hour on December 9 and  invoked his constitutional privilege against self-incrimination.

indictment issued on January 20 (Doc. 117), and it governs analysis of the pending motion.[2]

## II.

## STANDARDS OF REVIEW

Because his dismissal motion and request for sanctions did not identify the basis for judicial review of the relevant evidence,[3] the court directed the parties to address with specificity in post-hearing briefs the legal standards and evidentiary burdens which should control analysis for both the liabilities asserted and the remedies requested. White responded by specifying two issues:

> Should the District Court dismiss the Indictment now pending against the defendant, due to intimidation and threats by government agents, wrongfully coercing false statements and grand jury testimony upon which the Indictment is based?

> Are any additional sanctions against the United States due and proper under the facts of this case?

White proffers two standards of analytical review, each premised on the Due Process Clause of the Fifth Amendment to the United States Constitution : (1) the "*outrageous conduct defense*" and (2) *prosecutorial misconduct*.[4]

---

[2]Russell Duraski appeared as retained counsel for White at his arraignment on February 8, in lieu of White's former counsel, Julian McPhillips, and shortly thereafter gave notice of the parties' agreement that given the "lengthy hearing on this matter", the pending motion "should be ruled on by the court to simply complete the record." (Doc. 132, Feb. 24, 2006).

[3]Describing the challenged conduct as "investigatorial misconduct", White referenced generally the unreliability and unconstitutionality of evidence acquired by the Auburn Police Department's alleged acts in securing grand jury testimony against him through threats and coercion of witnesses. "The investigatorial tactics employed here are so egregious," White argued without specifying any case law support, "that dismissal of the government's case is the only adequate remedy." (Doc. 39 ¶¶ 1, 8-11 ).

[4]Defendant's Brief in Support of Motion to Dismiss Indictment and for Sanctions , Doc. 110 ("*Def.'s Br.*") at 1, 30-33.

The United States essentially adopts White's phrasing of the issues:

> Whether the Indictment, or Counts therein, are due to be dismissed upon White's claim of "outrageous conduct" displayed by government agents?

> Whether the Indictment, or Counts therein, are due to be dismissed upon White's claim of prosecutorial misconduct?

Regarding the controlling standards and burdens, the United States maintains, in relevant part:

> Measured under a totality of the circumstances "standard, Government involvement in criminal activity constitutes a due process violation only where it violates fundamental fairness, shocking to the universal cause of justice." *United States v. Gianni*, 678 F.2d 956, 960 (11th Cir. 1982) (internal citations and quotations omitted).

> In deciding whether an indictment is due to be dismissed for prosecutorial misconduct before a grand jury, a district court must determine whether there was misconduct and "ask whether the error before the grand jury substantially influenced the grand jury's decision to indict or whether there is grave doubt that the decision to indict was free from such substantial influence of such violations." *United States v. Vallejo*, 297 F.3d 1154, 1165 (11th Cir. 2002) (internal citations and quotations omitted).[5]

After due consideration of the parties' submissions, the court now summarizes the controlling standards for the issues identified on this evidentiary record.

## A.    Outrageous Conduct for Due Process Violation

In *United States v. Russell*, 411 U.S. 423, 432 (1973),[6] the Court recognized that it could be

---

[5]Government's Brief in Opposition of Defendant's Motion to Dismiss Indictment and for Sanctions, Doc. 121 ("*Gov't Br.*") at 6.

[6]Convicted for unlawful manufacture of methamphetamine, Russell plead entrapment as his sole defense. The Supreme Court reversed the judgment of a Ninth Circuit panel, which had reversed the conviction "solely for the reason that an undercover agent supplied an essential chemical for manufacturing the methamphetamine which formed the basis of Russell's conviction." That panel "concluded that as a matter of law 'a defense to a criminal charge may be founded upon an intolerable degree of governmental participation in the criminal enterprise'." 411 U.S. at 425, citing the Ninth Circuit's opinion at 459 F.2d 67, 673 (1972). While the Ninth Circuit decision offered alternative theories for its decision, the court explained that "both theories are premised on fundamental

(continued...)

confronted someday "with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, *cf. Rochin v. California*, 342 U.S. 165 (1952)." Such conduct by law enforcement would violate, the Court acknowledged, that "'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *Russell*, *id*. at 432, *quoting Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246 (1960).

Although the *Russell* case did not provide an appropriate factual context for the Court to clarify the outrageous conduct which is sufficient to trigger the Fifth Amendment, it is clear that a defendant relying on  the defense must show actual prejudice to warrant dismissal of an indictment with prejudice. *See United  States v. Morrison*, 449 U.S. 361, 364-66 (1981).[7] Cases presenting due process claims resting on outrageous official conduct "turn on the totality of the circumstances with no single factor controlling." *United States v. Gianni*, 678 F.2d 956 (11th Cir. 1982).[8]

_____

[6](...continued)
concepts of due process and evince the reluctance of the judiciary to countenance 'overzealous law enforcement'." 459 F.2d at 674 (quotation omitted).

[7]*See, e.g., United States v. Strouse*, 286 F.3d 767, 772 (5th Cir. 2002) (no dismissal of indictment when perjury was not "knowingly sponsored" by prosecutor);  *United States v. Castro*, 908 F.2d 85, 89 (6th Cir. 1990) (no dismissal of indictment because defendant's "bare allegations" of government use of false, perjured, or hearsay evidence do not show long-standing pattern of prosecutorial misconduct or actual prejudice); *see also United States v. Exarhos*, 135 F.3d 723, 727 (11th Cir. 1998) (grand jury proceedings not "fundamentally unfair" when government presented forged documents to grand jury because government unaware of forgery and other evidence directly implicated defendant).

[8]*See also United States v. Sanchez*, 138 F.3d 1410, 1413  (11th Cir. 1998) ("This Court recognizes the defense of outrageous governmental conduct, a defense interrelated with the sentencing manipulation theory.  This defense focuses on the tactics employed by law enforcement officials to obtain a conviction for conduct beyond the defendant's predisposition.  The question, however, is whether the methods comport with the Fifth Amendment's guarantee of due process.");
(continued...)

**B.**    **Prosecutorial Misconduct**

While a prosecutor cannot engage in improper conduct in bringing and presenting the government's case in order to secure a grand jury indictment, there is a strong presumption that the prosecutor has behaved properly in conducting grand jury proceedings. *See Costello v. United States*, 350 U.S. 359, 363 (1965) ("An indictment ... if valid on its face, is enough to call for trial ... on the merits.")  A claim of prosecutorial misconduct before the grand jury must be evaluated by inquiring if the misconduct "substantially influenced the grand jury's decision to indict" or whether there is "grave doubt that the decision [to indict] was free from such substantial influence [of such violations]. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 251 (1988); *see also United States v. Vallejo*, 297 F.3d 1154, 1165 (11th Cir. 2002).  False testimony before the grand jury justifies dismissal of an indictment if the false testimony results from "prosecutorial misconduct" that causes prejudice to the defendant.  *United States v. Verbitskaya*, 406 F.3d 1324 (11th Cir. 2005), *citing Bank of Nova Scotia v. United States, id.*

### III.

### DISCUSSION

**A.**    **Effect of post-hearing superseding indictment**

The Superseding Indictment filed January 20, 2006, did not include previously asserted counts charging White with wrongfully demanding and accepting money from Jerry Stinson, Shenard Pitts, and Mitchell Giles, each of whom testified by affidavit and at the evidentiary hearing

---

[8](...continued)
*United States v. Haimowitz*, 725 F.2d 1561, 1577 (11th Cir. 1984) ("Whether outrageous governmental conduct exists 'turns upon the totality of the circumstances with no single factor controlling' and the defense 'can only be invoked in the rarest and most outrageous circumstances.'").

in attempts to retract their testimony before the original grand jury as either coerced or otherwise the result of improper governmental intimidation or threats.  Because "White is no longer charged with any count associated with a person who provided an affidavit claiming he or she gave coerced testimony," the United States argues that "his entire motion is moot." To the extent that White's claims rest at all on the testimony of Stinson, Pitts, and Giles,[9] the court concurs that the superseding indictment has mooted the motion.  Whether the entire motion is mooted requires consideration of any other evidentiary underpinnings proffered.

### B.     Evidentiary Findings

Because it is the defendant's burden to present proof of the outrageous conduct and prosecutorial misconduct claims asserted as due process violations, the court examines the record to assess his other evidence.   The defense summoned as a witness only one other "victim",  Daniel Todd , who is referenced as "D.T." in the November 15 indictment (count 2) and in the current indictment (count 1).  Todd – unlike Stinson, Pitts, and Giles –  did not provide an affidavit purporting to discredit his grand jury testimony.   As now discussed, neither Todd nor any of the other six defense witnesses supplied any credible evidentiary support for White's legal claims of

---

[9]In their testimony on November 30, 2005, Stinson, Pitts, and Giles each rejected as "untrue" the respective counts in the November 15 indictment (also included in the original indictment – which described them as victims of defendant's 18 U.S.C.§ 1951(a) wrongdoing.  Instead, they vouched for their respective affidavits submitted with defendant's motion and attributed their contradictory grand jury testimony to threatening or otherwise intimidating acts and statements from Auburn police officers and/or FBI agents.  None provided any testimony which is probative on any count unrelated to his particular case. Pitts' wife, Michele, testified solely about her husband's involvement with the case, *see* Transcript of November 30, 2005 Evidentiary Hearing ("Tr. 1") at 165-179,  and his tax lawyer, James Cox, gave no testimony relevant to the counts unrelated to Pitts. (Tr. 1 at 82-99).

7

misconduct by the government.

### 1. *Testimony of Daniel Todd ("D.T.")*

It is undisputed that Daniel Todd ("Todd") is the victim identified only by his initials in

Count 1 of the current indictment, which declares:

> From an unknown date, but during about September 2004, the exact dates being unknown to the grand jury, in Lee County, within the Middle District of Alabama, the defendant, TYRONE WHITE, did knowingly, willfully, and unlawfully affect and attempt to affect interstate commerce and the movement of articles and commodities in interstate commerce by extortion, in that the defendant unlawfully obtained United Stares currency, not due him or his office, from D.T., with his consent, induced by wrongful use and threat of use of fear and under color of official right, specifically, the defendant demanded and accepted money from D.T. in exchange for treating D.T. favorably in connection with a pending City of Auburn Municipal Court case, in violation of Title 18, United States Code, Section 1951(a).

Summoned as the second defense witness on December 7, 2005, Todd, age 31, responded

as follows, in relevant part, on his direct examination by former defense counsel McPhillips:

> Q:   ***...you have never given Mr. White any money to fix a ticket?
>
> A:   No, sir.
>
> Q:   And has he ever asked you for any money to fix a ticket for you?
>
> A:   No, sir, [10]

Todd testified with palpable reticence and apprehension, and after he repeated his one-word denials

of any wrongdoing by White involving his city court case, the United States Attorney asked the court

to "instruct Mr. Todd of his rights against self-incrimination." The court then advised:

> The Court:   Mr. Todd, let me have your attention just for a moment. The Court's about to give you some instructions solely as a matter of caution. You

---

[10]Transcript of December 7, 2005 Evidentiary Hearing ("Tr.2") at 20:13-18.

gave testimony before a federal grand jury. You remember that, don't you?

The Witness:    Yes.

The Court:    In fact, you have now been identified as the D.T. referenced in count 2 of the indictment against Tyrone White. Your testimony here today clearly contradicts prior testimony. The United States has put you and others on notice of its concerns about perjured or false testimony being given to the grand jury. This court takes no position and makes no finding at this time on whether you have given false testimony. This Court's duty is to remind you of your constitutional right under the Fifth Amendment not to incriminate yourself. You have been summoned here as a witness, you are giving testimony which could be used by the United States in a later prosecution against you. You should know that you have the right to decline to answer any questions which in your judgment might end up being used against you. On the other hand, if you understand the rights the Court has just explained you may exercise your choice to testify so that you can explain your testimony today and explain your testimony on any prior occasion. Do you understand the rights I have just explained to you?

The Witness: Yes.[11]

Before testimony resumed the court received sidebar representations regarding Todd's contacts with the FBI and the United States Attorney's office , commencing on the night following the November 30 hearing, "about getting protection because he felt he was being threatened by people with the defense."[12] After due consideration, the court engaged Mr. Todd in open court as follows:

The Court:  Mr. McPhillips, before you resume, the Court desires to engage Mr. Todd just a bit further to be absolutely certain that he understands his rights and is testifying voluntarily, and understand that he will be expected to testify continuously until the United States completes its testimony. How old

---

[11]Tr. 2 at 22-23.

[12]In testimony during the United States' subsequent presentation of witnesses, Jackie Vickers, a victim-witness coordinator for the United States Attorney's Office, confirmed Todd's communications with her office and its responses. See Tr. 2 at 162-170.

are you again, Mr. Todd?

The Witness:   31.

The Court:   Tell me the extent of your formal education.

The Witness:   Lafayette High school, went to the 11th grade.
***
The Court:   What kind of work do you do now?

The Witness:   Auto mechanic and diesel mechanic.

The Court.   All right.  Have you ever given testimony in a state or federal court before as a witness?

The Witness:   No.

The Court:   Have you ever sued anybody as a Plaintiff?

The Witness:   No.

The Court:    Have you ever been sued?

The Witness:   Yes.
***

The Court:    All right.  Do you have someone now you consider to be your lawyer?

The Witness:   Yes.

The Court:    And you understand your right at any time to go and seek advice from a lawyer when you are uncertain what you should or should not do; is that correct?

The Witness:    Yes.

The Court:    Even now, if you have any question about your testimony here today, your testimony before the grand jury, you understand your right to decline to testify until you get further advice from your lawyer?

The Witness: Can I decline?
***

The Court:   I am telling you now that you have the right – if you want to seek advice from your lawyer before you testify, you have the right to decline if the reason is you are concerned that you may end up giving testimony that will incriminate you.  Now, that's a big word, but all it means is you do not have any duty to help the United States by giving evidence that can be used against you.  When I told you earlier that the United States has put the Court on notice of its belief that witnesses may be testifying falsely here today I was referring to the fact that you gave testimony earlier to a grand jury.  You gave testimony under oath as you are today giving testimony.

Mr. McPhillips already has established through your testimony thus far that you are indeed the person referred to in count two of the indictment against Tyrone White.  Count two basically has you saying that you either gave money to Mr. White or Mr. White demanded money from you or otherwise you were involved in a ticket fixing scheme.  That is what Mr. White is accused of basically.  Now, your testimony thus far flatly denies that.  Mr. McPhillips asked you if the allegations or the statements in the indictment involving you were true and you said no.

Now, the Court has an obligation to let you know that the United States considers your testimony to be false, and that the United States has the right to begin a criminal prosecution against you for making a false statement.  Under the Constitution of the United States you may decline to answer any further questions if you believe that doing so will further get you into some kind of criminal prosecution.  Of, if thus far you have been made to believe that at least you ought to talk with your lawyer about whether you should continue to give testimony, if that is your choice the Court will simply honor your right, give you the opportunity to go make a phone call or otherwise make contact with your lawyer, and let you determine whether you wish to give further testimony.  Now, does that clarify matters for you a bit more?

The Witness:   Yes.[13]

After excusing Todd to make telephone contact with his lawyer, the court resumed the hearing with another witness but recessed a few minutes later to receive Todd's on-the-record report with only counsel present; because he could not reach either his Auburn lawyer or Opelika lawyer, did not wish to continue his testimony without legal advice[14], and could not return the next day, the

---

[13]  Tr. 2. at 26-29.

[14]Queried by the court about proceeding with his cross-examination testimony, Todd
(continued...)

11

court discharged Todd to appear with counsel on December 9.  At the scheduled hour, Todd

returned with Auburn counsel, Margaret Young Brown, who represented Todd's "desire to invoke

his Fifth Amendment rights against self-incrimination and not testify further . . . even to clarify the

testimony already given on December 7th "; the court then ascertained directly from Todd the

representations made by counsel.[15]

---

[14](...continued)
responded in the negative, explaining:

> I would rather talk to my lawyer because I mean when it first happened I was
> throwed in jail for four days and I had to give them a testament saying one
> thing even to get out of jail.  They didn't want to let me out of jail.  They have
> me here today under the same situation, scared about going to jail about
> telling the truth, still about the situation.  I was stopped and I was thrown in
> jail for four days, I had a little fine.  My fiancé went to pay the fine, they
> wouldn't let me out.  I went back four days later, they told me if I cooperate
> and tell them what they want to hear they will let me out that day.

> The Court: So you have a fear today about what?

> The Witness: The whole situation.  I mean if I give another testament, if it's
> true still, if they don't – if they don't think it's true, the United States, I still
> perjure myself and I still go to jail.

> The Court: All right.  Now, you have already given some testimony under
> oath this morning.

> The Witness: Yes ma'am.

> The Court: Do you wish to stand by that testimony or do you prefer to talk
> with your lawyer before you say anything else about that testimony?

> The Witness: I want to talk to my lawyer before I say anything else.

(Tr. 2 at 57-58).

[15]The court began the proceeding on December 9 by providing to counsel – and affording her
an opportunity to review in private – a transcript of his testimony in court on December 7; counsel
(continued...)

12

Based on the evidentiary record summarized, the court finds that Todd's testimony has no probative value at all on White's asserted due process claims – outrageous conduct and prosecutorial misconduct – for dismissing his indictment.

### 2.    Witnesses *Floyd, White, Henderson, Bass, Copeland, and Norman Pitts*

The common thread in the testimony of defense witnesses Floyd, White, Henderson, Bass, Norman Pitts, and Copeland, is their opinions that defendant White has not engaged in the ticket-fixing scheme indicted and that Auburn police officers and FBI agents engaged in harassing and intimidating tactics in an attempt  to secure from them damaging testimony against White.   Bass and Copeland gave testimony to the grand jury which indicted White initially.

Adam Floyd ("Floyd"), the owner of a beauty salon and car wash in Auburn, has known White for 15 years and is also  Todd's first cousin.   After being interviewed at least twice by FBI agents and Auburn police officers, Floyd declined further meetings and maintains that he suffered consequentially frequent visits by officers to his business so harassing that he complained to a police lieutenant and the Mayor that the Auburn police were trying to "hurt [his] business by intimidating ..employees and...customers." Officers allegedly told an employee "that he was going to have to find other work, because they were going to lock [Floyd] up, or get rid of [him] some way, and then close [Floyd's]  business down." Though Floyd received a subpoena, officers returned later to advise that

--------

[15](...continued)
confirmed her receipt from the U.S. Attorney's office on December 8 a copy of Todd's grand jury testimony.   See Transcript of December 9, 2005 Evidentiary Hearing  ("Tr. 3") at 2-4.

he need not attend the grand jury proceedings.[16]

Winfred White, the employee referred to by Floyd, also testified by affidavit and at the hearing about his questioning by officers who believed that he "paid Officer White" to drop a ticket received while riding his motorcycle; according to Winfred White, FBI agents and Auburn police officers did not appear to believe that he "got [the] ticket dropped" by completing driving school.[17] Asked pointedly if he felt "threatened in any way" by the officers' persistent questions about Defendant White and Floyd, White replied:   "I just felt – I mean very uncomfortable."  Regarding any specific threats by officers regarding his job security, White testified:

> They made the statement that they were glad that I had finished school and that I had a degree because I was going to have a chance to use it and that I was going to have to find me somewhere else to work.  ***  I didn't know how to feel.  And I didn't know what was going to come about from the whole thing, or like what was going on.  So like nervous and scared.[18]

On cross-examination Winfred White recalled five occasions that officers visited Floyd's shop, admitted that none told him what to say, and specified their "most threatening" as "just threatening my job and it was the well-being at the shop."[19]

Like Winfred White, Myrtis Henderson ("Henderson") testified about her "embarrassment" by officers coming into her neighborhood to question her about any relationship with Defendant

---

[16]Def.'s Ex. 24; Tr.2 at 4-18.

[17]Def.'s Ex. 26; Tr. 2 at 35-55.

[18]Tr. 2 at 42-43.

[19]Tr. 2 at 53.  White explained: " we were trying to run a business and you know, every other day they would come up there , or, you know, just the feeling . . . the uncomfortable feeling of all those cars coming up there and I guess the perception of the public, you know, in front of your customers and everything, and you know, car loads of police officers and agents coming up there."

White, with whom her niece discussed the ticket which "had been taken care of" by the time Henderson went to pay the fine. Henderson denied ever giving White any money or other consideration although Auburn police officers "didn't believe [her]."[20] These officers did not, however, force her to make any particular statement and made no threats to harm or hurt her in any manner. Henderson, like Winfred White, refused to characterize the officers' conduct as threatening or intimidating.[21]

Willis Edward Bass ("Bass"), acquainted with the defendant about two years, "wasn't intimidated because [he] was telling the truth [and] felt comfortable" when interviewed by Auburn police Officer Smith and FBI Agent King. He acknowledged that Defendant White "had taken care of a speeding ticket" for him "[by speaking] to the officer that wrote the ticket." He denied any monetary consideration and explained that White "had done this as a friend." [22] Officers did not threaten Bass or his family; Bass did not feel intimidated then or since; and no one "from the U.S. Attorney's office or the FBI or any other agency attempted to intimidate [him] in any way to get

---

[20]Def.'s Ex. 16; Tr. 2 at 64-73.

[21]Tr. 2 at 71-72. See also Tr. 2 at 68:

> Q: (defense counsel)   Did the Auburn police or the FBI ever make you feel threatened or intimidated?
>
> A:  I haven't talked to the FBI, but the Auburn police department when they came in that  truck and stuff, I felt like I didn't know what I had done wrong.
>
> Q:   So did you feel threatened in any way?
>
> A:   I didn't feel threatened,   I just – I mean I felt a little pressure.

[22]Def.'s Ex. 18; Tr. 2 at 80, 74-83.

[him] to change what [he] said the day [he was] called down to the station."[23]

Both Donald Copeland ("Copeland")and Norman Pitts ("Pitts") did feel intimidated by the officers' questioning. In affidavit testimony Copeland claimed "FBI agents were trying to coerce [him] into saying something that was not true" after he "told them Mr. White had not taken care of any tickets for [him]."[24] Subsequently arrested by Auburn police for his failure to appear in court on a driving violation, Copeland testified that he felt nonetheless that he was being taken to jail for "not cooperating on the Tyrone White investigation." Copeland did not establish, however, any error in his arrest or in the underlying driving citation, and on cross-examination, clarified his opinion that officers tried to embarrass him by having him questioned at grand jury about his "bad driving record."[25]

When questioned at Auburn police headquarters, Norman Pitts, acquainted with the defendant for ten years, "told [Officer Dawson and Lt. Holder] that [he] had never given Mr. White money to fix tickets." In a meeting at Officer Dawson's house, Pitts learned of the investigation involving the defendant:

> Dawson said Tyrone was going to be in some trouble, and that I was going to be in trouble with him. Dawson told me that I would be locked up in prison. Then he asked if I was married and whether I had kids. I told him that I had a wife and kids. Dawson asked if I had a house. I told him I did. Dawson then said it would be a shame to lose all that, to lose my job over something with Tyrone. He kept saying it was not worth it. I kept telling Dawson that I never gave Tyrone any money, and

---

[23]Tr. 2 at 83.

[24]Def.'s Ex.22.  Agents allegedly threatened to subpoena his wife while Auburn police "said we were both going to be in trouble, and that we would be put in jail.  My wife and I have a four year old son.  The Auburn police were asking what we were going to do with our son when we both got thrown in jail."  *Id.*

[25]Tr. 2 at 89, 92.

that I did not know what was going on. Tyrone took care of my ticket out of the
kindness of his heart.  I told Dawson that I could not say I gave Tyrone any money,
because I had not given him any money.[26]

When Lt.  Holder arrived shortly thereafter, Pitts again denied giving money to White to get rid of

a DUI ticket and claims that Holden "got mad, cursed [him] out" and joined Officer Dawson in

"saying that I could lose my job... and my house and my job." [27]  In  hearing testimony Pitts placed

these remarks by the officers in the context of penalties for DUI infractions,[28] denied any threats to

his person or family and admitted that officers did not dictate his testimony to the grand jury.

Lt. Jerry Holder ("Lt. Holder"), the Auburn police lieutenant in charge of investigating the

ticket-fixing scheme underlying White's indictment, testified credibly concerning his interviews with

Winfred White, Norman Pitts, Myrtis Henderson, Donald Copeland, and Daniel Todd.

---

[26]Def.'s Ex. 20  ¶¶ 3-7.

[27]*Id*.  ¶¶ 8-13.

[28]Q:   Any time they tell you this is what you need to say?

> A:  No.  Just saying I could lose my job and lose my house.  Said ain't you got kids?
> I said yeah, I have got two little kids.  Well, you got to take care of your kids.

> Q:  Was that because if you were lying about something you could be charged with
> Something?

> A:  That was because of the DUI.  Because of the DUI if I lose my license, I lose my
> license, I lost my job.  I told them hey, I haven't gave him any money, so if I get
> Charged with the DUI, I have just got to pay it.  Do the crime, do the time.

> Q:  So in other words they were merely about the consequences of the crime you had
> already committed.

> A:   That's how they were trying to scare me.

(Tr. 2 at 111-112).

His testimony regarding these witnesses' denials of contributory wrong-doing mirrored theirs in

material part and he denied threatening them at any time.[29]  Prior to interviewing Norman Pitts, Lt.

Holder had already examined a file which reflected that Pitts "had been arrested for DUI but that

he had never been adjudicated."  He recalled as follows their one-time discussion about the ticket:

> But when I asked him about it he first made out like he hardly even knew Tyrone
> White and then he said he met him through a friend of his named Willis Bass and
> that he had only talked to him one time at a barbecue or something and after he
> talked to him that Officer Whire agreed to help him out with his DUI but he never
> paid any money for it or whatever and it just went away.  And that actually at some
> later time Officer White met him and gave him his driver's license back.[30]

Lt. Holder reported that Copeland voluntarily provided his statement at police headquarters  absent

any coercion, promises, or threats:

> He denied making any payments, and said that he didn't know why Officer White
> helped him out on that ticket.  I think it was his ninth or tenth citation for driving
> revoked, and when we interviewed him we stopped him and wrote him his 11th ticket
> for driving while revoked.  He came to the police department on his own free will and
> we talked to him but he admitted that Officer White somehow took care of his case

---

[29]See Tr. 2 at 201 (Winfred White); at 219 (Norman Pitts); at 222 (Myrtis Henderson)
Concerning Todd, who made a counseled refusal to testify on Fifth Amendment grounds, Lt. Holder
testified:

> Just like the rest of the them, he was arrested for DUI and carrying a pistol
> without a permit.  The arresting officer recalled Officer Tyrone White coming
> to him and asking him to agree to drop the gun charge and allow him to plead
> to a DUI.  The plea agreement was worked out at the request of Officer
> White.  The arresting officer went along with it.  So we pulled Mr. Todd's
> court file and then I interviewed Mr. Todd as well. *** He said he paid
> Tyrone White a thousand dollars to have the gun charge dropped and arrange
> for him to plead guilty to DUI.

(Tr. 2 at 220-221).  Testimony by FBI agents Christian Deeb and Paul Houston corroborated Todd's
contacts with the FBI –  following the hearing on November 30 – to report his fear for his and his
family's lives and to request protection.  (Tr. 2 at  266-268, 283-287).

[30]Tr. 2 at 218-220.

but he denied ever paying him any money for doing so.[31]

### C.    Analytical Conclusions

On this evidentiary record the court readily concludes that Defendant White falls woefully short of his burden to demonstrate either outrageous conduct or prosecutorial misconduct sufficiently to establish a violation of his due process rights under the Fifth Amendment.  No policeman or agent interviewed or attempted to interview any witness , or otherwise intimidated, harassed, or coerced the witness, in any manner which offends notions of "fundamental fairness"  or is "shocking to the universal sense of justice."  Of the seven witnesses presented by the defense on non-mooted claims, one (Daniel Todd) solicited law enforcement for protection from perceived intimidation by the defense camp ;  three (Bass, Henderson, and Winfred White) testified indisputably that their statements to law enforcement and/or the grand jury did not result from officers' intimidation, threats, or coercion of any degree; and affidavit testimony to the contrary from the remaining two – Norman Pitts and Donald Copeland – simply did not withstand scrutiny when reviewed in the context of their hearing testimony as well as other hearing testimony of relevance.  There is absolutely no showing that prosecutors knowingly presented to the grand jury any false, tainted, coerced, or otherwise unreliable evidence from these witnesses; indeed, no evidence of prosecutorial misconduct is pinpointed for analysis.[32]

Examination of the paltry case law examining the "outrageous conduct" defense within this circuit uncovered a case which lends credence to the court's analysis of the totality of the

---

[31]Tr. 2 at 223.

[32]*See United States v. Vallejo*, 297 F.3d at 1165 (finding no plain error in district court's failure to dismiss indictment based on prosecutor's conduct before the grand jury).

19

circumstances relevant in this case. On a writ for habeas relief following his murder conviction, in *Wilcox v. Ford*, 813 F.2d 1140 (11th Cir. 1987), prison warded Ford cross-appealed from the district court's holding, *inter alia,* that "intimidation tactics" by the police in interrogating three employees of the Wilcox business, ... violated Wilcox's Fifth Amendment right to due process," a claim deriving from *Russell* and its progeny. The appellate court described as follows some of the questionable interrogation of the three men – Wrenz, Marshall, and Goodman (who did not testify at trial):

> During the course of their interrogation the police officers told Goodman, a thirty-five year old black man, that they planned to hold him indefinitely and that they would "fry his ass." . . . Wrentz was a very old, illiterate black man with what one police officer described as the "old slave syndrome.: The police officer testified that he discovered that Wrentz would agree to anything a white man asked him in a leading question format. The transcripts reflect that the interrogating officers threatened to charge Wrentz with murder, threatened to lynch him, put words in his mouth, and told him he was headed for eternal damnation. . . . Marshall received similar treatment. He was in his late sixties at the time of the interrogation and illiterate. Marshall was interrogated for eight and a half hours without being provided with food or water. The officers then threatened to send him to the electric chair.

813 F.2d at 1148.

> In distinguishing *Russell* and its progeny, the Eleventh Circuit reasoned:

> [T]he "government misconduct" at issue in the *Russell* line of cases has been confined to alleged government over-involvement in the planning and/or execution of a crime in a sting or reverse sting operation, rather than to a more general concept of government misconduct. The allegation of misconduct in this case, improper interrogation of witnesses, is not a claim that the police were over-involved in the planning or execution of the crime. This Circuit has not yet passed upon whether *Russell* may be read more broadly to apply outside of the narrow context of government over-involvement in a sting operation. *** While we do not hold that *Russell* can never apply to a situation other than one alleging police over involvement in a sting operation, we do hold that it does not apply to the facts of this case. The police misconduct here, while not commendable, is not so extreme that it violates a sense of "fundamental fairness, shocking to the universal justice" as far as Wilcox's constitutional rights are concerned. Nor do we find that this case presents "the rarest and most egregious circumstances" which might justify finding that Wilcox's due process rights were violated under *Russell.*

*Id.* at 1148. [33]

## IV.

## CONCLUSION

Based on the stated evidentiary findings and legal conclusions, it is the RECOMMENDATION of the Magistrate Judge that Defendant's *Motion to Dismiss and for Sanctions* (Doc. 39) be DENIED.

It is further ORDERED that the parties shall file any objections to this Recommendation not later than March 21, 2006. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of

---

[33]In *Brown v. Jones*, 255 F.3d 1273 (11th Cir. 2001), another habeas petitioner convicted of capital murder, claimed a violation of his Eighth and Fourteenth Amendment rights because the trial court permitted testimony from a co-defendant witness, Davenport, "which was directly related to the issue of Brown's intent [and] was procured through coercive prosecutorial tactics" in questioning him in preparation to testify at Brown's trial. Citing *Wilcox v. Ford*, the court ruled that "[t]he interrogation methods used by the prosecutors when questioning Davenport fall short of the level of egregiousness necessary to constitute a violation of Brown's constitutional rights." The court described the interrogation of two hours, taped in its entirety, as "almost mild-mannered compared to" the interrogation which passed constitutional muster in *Wilcox*. See also *United States v. Edenfield*, 995 F.2d 197 (11th Cir. 1993) ( reversal of a district court's dismissal of the federal indictment for "outrageous misconduct" by state investigating officers, led by a county sheriff – on bad terms with the defendants' father – who offered to pay and did pay a substantial fee for assistance from a confidential informant in getting the defendants busted for trafficking at least an ounce of cocaine; the informant, a friend of the defendants, volunteered because his "car business was failing and he needed money.").

issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 7th day of March, 2006.

**/s/ Delores R. Boyd**
DELORES R. BOYD
UNITED STATES MAGISTRATE JUDGE